*Decisions will be entered under Rule 155.*

NORTH AMERICAN SEQUENTIAL SWEEPSTAKES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4425–78X.     Filed November 3, 1981.

*Malcolm D. Katz*, for the petitioner.
*Elizabeth D. DePriest* and *Richard Shipley*, for the respondent.

OPINION

WILES, *Judge*: Respondent determined that petitioner does not qualify for exemption from Federal income tax as an

---

[29]See the discussion of the determination of ordinary income under sec. 751 *supra.*

organization described in section 501(c)(3).[1] Petitioner, challenging respondent's adverse determination, has invoked the jurisdiction of this Court for a declaratory judgment pursuant to section 7428.[2] The sole issue for decision is whether petitioner was operated exclusively for one or more exempt purposes within the meaning of section 501(c)(3).

This case was submitted for decision on the basis of the certified administrative record under Rule 217(b), Tax Court Rules of Practice and Procedure.[3] The evidentiary facts and representations contained in the administrative record are assumed to be true for purposes of this proceeding.

Petitioner North American Sequential Sweepstakes is a nonprofit corporation which was incorporated under the laws of the State of Washington on July 6, 1976. Its principal office was in Seattle, Wash., when it filed its petition in this case.

On December 28, 1976, petitioner mailed to respondent a Form 1023, Application for Recognition of Exemption, under section 501(c)(3). On February 7, 1978, respondent issued a final adverse ruling letter which denied petitioner's tax-exempt status for the following reasons.

1. Your activities are not exclusively educational or charitable as described in section 501(c)(3) of the Code,

2. You are not operated exclusively in furtherance of any exempt purpose described in section 501(c)(3) of the Code, and

3. You are not organized exclusively in furtherance of one or more exempt purposes described in section 501(c)(3) of the Code.

For purposes of this proceeding, the parties have stipulated that petitioner was organized exclusively for one or more exempt purposes within the meaning of section 501(c)(3).

According to petitioner's articles of incorporation, it was organized for the following purposes:

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.

[2] The statutory prerequisites for declaratory judgment have been satisfied: petitioner is the organization whose qualification is at issue, sec. 7428(b)(1); petitioner exhausted its administrative remedies, sec. 7428(b)(2); and petitioner filed its petition before the 91st day after respondent mailed his determination, sec. 7428(b)(3). See also Rule 210(c), Tax Court Rules of Practice and Procedure.

[3] All "Rule" references are to the Tax Court Rules of Practice and Procedure.

to promote and conduct a sky diving exhibition at Fort Lewis, Washington, from September 3 through September 6, 1976, and to do everything necessary, proper, advisable and/or convenient for the accomplishment of these purposes, either alone or associated with others, and to do all things incidental to, growing out of, or connected with said purposes.

Petitioner's board of directors has three members: David B. Singer, who is also petitioner's president, Craig Fronk, and Robert O. Porter. David B. Singer (hereinafter Singer) and Craig Fronk (hereinafter Fronk) were experienced skydivers. Singer had approximately 5 years of experience as a skydiver, making over 1,200 parachute jumps. Fronk had made over 2,000 parachute jumps and was an experienced exhibition organizer. Robert O. Porter was the president of the Fort Lewis Sport Parachute Club.

During 1974 and 1975, Singer was a member of the United States Freefall Exhibition Team (hereinafter the exhibition team), which developed a new form of skydiving referred to as "sequential relative work." This novel skydiving technique was a variation of "relative work" which had recently been adopted for use in international competition. "Relative work" refers to team freefall jumps of two or more skydivers who come into contact with one another in mid-air and perform a single maneuver whereby they align themselves in a certain formation. "Sequential relative work" involves a team freefall where the skydivers perform a series of three or four different maneuvers and formations during a jump.

In January 1976, B. J. Worth (hereinafter Worth), the captain of the exhibition team and a pioneer in sequential relative work, attended a meeting of the Federation Aeronautique Internationale (hereinafter FAI), the international governing body of air sports. At the meeting, Worth presented a set of proposed rules for international competition in sequential relative work and reported on the team's progress in developing the technique. The meeting revealed that South Africa intended to host the Smirnoff World Cup of Parachuting Relative Work in November 1976 and that sequential relative work would be included in that competition. The FAI agreed to sanction the World Cup with a view towards

including sequential relative work in the next world championships in 1977,[4] if the meet was successful.

After the meeting of the FAI, Singer, Fronk, and Worth, all of whom had an extensive background in sequential relative work, contacted the United States Parachute Association (hereinafter USPA) and offered to form an organization to sponsor a national competition based upon sequential relative work in the fall of 1976. In March 1976, Singer met with the board of directors of the USPA. The USPA agreed to sanction the planned competition and the winning four-man and eight-man teams as the representatives of the United States for purposes of the World Cup.[5]

After acquiring the USPA's approval, Singer began searching for a suitable site to hold the competition. In April 1976, he approached the Fort Lewis Sport Parachute Club, hoping to obtain military support for the event. Eventually, he was authorized to hold the meet at Fort Lewis and received written approval from the Department of the Army for the flying time needed to conduct the competition. Thereafter, preparations for the meet were delayed to await petitioner's incorporation by Fronk on July 6, 1976. In early August, however, Singer learned that the Department of Defense had suspended the use of military aircraft by civilians for skydiving, and he arranged to use civilian aircraft for the competition.

Petitioner's national sequential relative work competition was opened to the membership of the USPA, consisting of 13,000 members. Each participant was charged an entry fee of $60 to defray the expenses of the meet. Petitioner sent each entrant a copy of its proposed rules of competition and diagrams of the various formations which would be used in the meet.

On September 2, 1976, petitioner conducted a precompetition seminar. During the seminar, petitioner showed films of the maneuvers to be used in the competition, made a presentation of the rules which would govern the competition, suggest-

---

[4] The world championships in relative work are only held in odd-numbered years.

[5] Normally, the USPA only sponsors U.S. teams in international competition during years in which the world championships are held.

ed pitfalls which should be avoided, and held a general discussion of sequential relative work techniques.

From September 3, 1976, through September 7, 1976, petitioner held its skydiving competition at Fort Lewis, Wash. There were 18 teams, consisting of 127 skydivers, which participated in the competition. The three men who were responsible for petitioner's creation, Fronk, Singer, and Worth, participated in the competition. Each of them was on a different eight-man team, and Fronk and Worth were the captains of their respective teams, "Cleareye Express" and "Country Hod & The Fish."

Petitioner notified the public of its competition by means of an advertisement in the Fort Lewis Ranger and local coverage provided by the Tacoma News Tribune. Approximately 100 spectators attended the competition.

The first place team in petitioner's eight-man team competition was Cleareye Express, Fronk's team. In petitioner's four-man team competition, "Michigan Freefall" and "Devil Babies" tied for first place.

In October 1976, petitioner's president, Singer, attended a board of directors meeting of the USPA to report on the performance of the judges and jumpers at the September competition. He also made recommendations with respect to improvements to the rules of competition and the inclusion of sequential relative work in the national competition scheduled in 1977. In his report to the USPA, Singer stated that petitioner would provide $10,000 of financial support towards the first place eight-man team's participation in the World Cup. No financial support was provided for either of the first place four-man teams.

During the period following the competition and prior to the World Cup, petitioner's first place eight-man team, Cleareye Express, made frequent training jumps at which both Singer and Fronk were present. On October 14, 1976, one week before the team's departure for South Africa, the members of Cleareye Express and Singer, as "team leader," traveled to the Pope Valley Parachute Ranch in Pope Valley, Calif. During the next week, the team made approximately 30 practice jumps, accompanied by a freefall photographer, who filmed their maneuvers. By the end of the traning session, the films of the maneuvers were developed and the entire group reviewed

those films in a final effort to prepare for the World Cup. After the training session, the team and Singer departed for South Africa.

From October 24, 1976, through November 6, 1976, the World Cup was held in South Africa. Approximately 125 skydivers participated in the competition. During the competition, two formal seminars on sequential relative work techniques were held. At those seminars, Fronk showed the films of the recent training session in California. In the World Cup's eight-man team competition, Cleareye Express took second place.

In 1976, petitioner received total contributions of $18,518.89. Singer contributed $14,768.95 to petitioner, while the remainder was contributed by unspecified "team members" after petitioner's meet had ended. All of the funds contributed to petitioner were used to provide financial support to Fronk's team, both for its practice sessions prior to the World Cup and for its participation in the World Cup. All of the expenses of the competition held by petitioner were covered by the entry fees.[6]

Petitioner maintains that it was operated exclusively for exempt purposes, and that it did not operate to further private interests. According to petitioner, it was organized and operated to educate the public and the skydiving community with respect to team skydiving and sequential relative work, and its competition was conducted to develop the skills of the individual competitors and to exhibit the sport to the public. Accordingly, petitioner argues that it operated as a tax-exempt educational organization under section 501(c)(3). Furthermore, petitioner contends that it was operated exclusively to further amateur athletics and, therefore, qualifies as a section 501(c)(3) organization under *Hutchinson Baseball Enterprises, Inc. v. Commissioner*, 73 T.C. 144 (1979), on appeal (10th Cir., Apr. 3, 1980).

Respondent, on the other hand, contends that petitioner was not operated exclusively for exempt purposes. It is respon-

---

[6]The administrative record does not indicate whether or not petitioner has engaged in any activity since 1976. Although petitioner may not be engaged in any ongoing activity, it is clear that jurisdiction over this controversy has been conferred upon us under the literal language of sec. 7428 (see note 2 *supra*), and our resolution of the issues raised herein will determine petitioner's tax-exempt status for the period under consideration.

dent's position that petitioner's exempt activities were incidental to its primary nonexempt purpose to hold a recreational event for a small number of skydivers, especially its organizers. For the reasons set forth below, we hold for respondent.

Section 501(a) provides tax-exempt status to organizations described in section 501(c). Section 501(c)(3) provided as follows as of the date of petitioner's incorporation:

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

> \*      \*      \*      \*      \*      \*      \*

> (3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

The burden of proof is on petitioner to show that respondent's determination denying the exemption is incorrect. Rule 217(c)(2)(i). To qualify for exemption under section 501(c)(3), an organization must satisfy both the organizational and the operational tests. Sec. 1.501(c)(3)–1(a)(1), Income Tax Regs. For purposes of this proceeding, respondent has stipulated that petitioner qualifies for exemption under the organizational test.

In order to satisfy the operational test, an organization's activities must primarily be those which accomplish one or more exempt purposes as specified in section 501(c)(3) and not, except to an insubstantial part, those which further a nonexempt purpose. Sec. 1.501(c)(3)–1(c)(1), Income Tax Regs. A substantial nonexempt purpose will disqualify an organization from exemption under section 501(c)(3) regardless of the number or importance of its exempt purposes. *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945). Furthermore, to satisfy the operational test, an organization must serve public purposes rather than private interests. Sec. 1.501(c)(3)–1(d)(1)(ii), Income Tax Regs. See *Baltimore Health and Welfare Fund v. Commissioner*, 69 T.C. 554, 557 (1978). It is the purpose, and not the nature of the activities, which

governs the application of the operational test. *Ohio Teamsters Educational and Safety Training Trust Fund v. Commissioner,* 77 T.C. 189 (1981); *Federation Pharmacy Services v. Commissioner,* 72 T.C. 687, 691 (1979), affd. 625 F.2d 804 (8th Cir. 1980). Since a given activity may serve both exempt and nonexempt purposes, the operational test is satisfied only if the predominate motivation underlying such activity is an exempt purpose. *Hutchinson Baseball Enterprises, Inc. v. Commissioner, supra* at 154; *B.S.W. Group, Inc. v. Commissioner,* 70 T.C. 352, 357 (1978). Whether such motivation exists is a question of fact. *Christian Manner International, Inc. v. Commissioner,* 71 T.C. 661, 668 (1979).

Section 501(c)(3) specifically includes "educational" purposes among the exempt purposes set forth therein. See also sec. 1.501(c)(3)–1(d)(1)(i)(*f*), Income Tax Regs. Section 1.501(c)(3)–1(d)(3), Income Tax Regs., defines the term "educational" to include:

(*a*) The instruction or training of the individual for the purpose of improving or developing his capabilities; or

(*b*) The instruction of the public on subjects useful to the individual and beneficial to the community.

In *Hutchinson Baseball Enterprises, Inc. v. Commissioner, supra,* this Court held that the promotion, advancement, and sponsorship of amateur athletics is an exempt purpose under section 501(c)(3) and found that the organization therein was organized and operated exclusively for such a purpose. Although our opinion in *Hutchinson* acknowledged that such a purpose did not literally fall within the classifications enumerated in section 501(c)(3), we found the advancement of amateur athletics to be within the charitable purposes exempted from taxation thereunder.

On the record before us in the instant case, we are convinced that the predominate motivation underlying petitioner's activities was to further the recreational interests of its *creators,* Fronk, Singer, and Worth. See sec. 1.501(c)(3)–1(d)(1)(ii), Income Tax Regs. See also *Syrang Aero Club, Inc. v. Commissioner,* 73 T.C. 717 (1980). Although petitioner was operated in a manner that may have incidentally furthered educational purposes and advanced amateur athletics, we must conclude that petitioner primarily served the private interests of its creators. See *Callaway Family Association, Inc. v. Commis-*

*sioner*, 71 T.C. 340 (1978). All three of these men were intimately connected with petitioner's creation, Fronk and Singer were on petitioner's board of directors, Singer was petitioner's president, and Fronk was its incorporator. Each of them was an avid skydiver and had developed a keen interest in sequential relative work. In addition, they all participated in the competition held by petitioner. It is clear that they wanted to pursue their personal interests in skydiving and used petitioner for that purpose.

While we know that Fronk, Singer, and Worth had an extensive background in sequential relative work, there is nothing in the record which indicates whether any of the other participants were experienced in this form of skydiving. If Fronk, Singer, and Worth were the only experienced sequential relative work skydivers in the competition, one of their teams was almost assured first place. Significantly, Fronk, Singer, and Worth each competed on an eight-man team, and petitioner only provided financial support to the first place eight-man team. Furthermore, it was only after Fronk's team won the eight-man event that Singer's report to the USPA indicated that petitioner would provide $10,000 of financial support to that team's participation in the World Cup. There is nothing in the record which firmly establishes that petitioner had previously intended to provide such support. Moreover, no effort has been made to explain why similar financial support was not provided to either of the two four-man teams which tied for first place. Clearly, under these circumstances we cannot find that petitioner has sustained its burden of proof.

Finally, while the entire cost of the meet held by petitioner was defrayed by the entry fees, all of the funds contributed to petitioner were used for the benefit of its creators. Most of these funds were contributed by Singer, and the remainder were contributed by unspecified "team members" after Fronk's team won the eight-man event. Certainly, we are justified in inferring that these unspecified contributors were members of Fronk's team, if not Fronk himself. The funds contributed to petitioner were used to pay for the team's practice sessions and its participation in the World Cup, and the amount which was so used greatly exceeded the $10,000 of financial support that Singer had told the USPA that petitioner would provide. In addition, it appears that petitioner paid

for Singer's trips with the team to Pope Valley, Calif., and to South Africa. Since Singer made these trips as "team leader," we believe that his travel expenses were paid by petitioner as part of the team's expenses. Thus, the manner in which petitioner spent its funds also supports the conclusion that petitioner was operated for the private benefit of its creators.

On the basis of the entire record herein, we hold that petitioner was operated for a substantial nonexempt purpose, to further the recreational interests of its creators. Accordingly, we must sustain respondent's determination.

To reflect the foregoing,

*Decision will be entered for the respondent.*