COPYRIGHT CLEARANCE CENTER, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4591–81X.     Filed November 15, 1982.

*Leonard J. Henske, Jr.,* and *William J. Lehrfeld,* for the petitioner.

*Adeline P. Malone,* for the respondent.

OPINION

RAUM, *Judge*: The Commissioner determined that petitioner does not qualify for exemption from income taxation as an organization described in section 501(c)(3), I.R.C. 1954, and petitioner has invoked the jurisdiction of this Court to obtain a declaratory judgment as to its exempt status.[1] The question presented is whether petitioner is organized and operated exclusively for exempt purposes. The case was submitted on the basis of the stipulated administrative record, which is incorporated herein by reference. The factual representations in the administrative record are accepted as true. Rule 217(b), Tax Court Rules of Practice and Procedure.

The Copyright Clearance Center, Inc. (hereinafter petitioner or the Center), is a corporation organized in July of 1977 under the Not for Profit Corporation Law of New York. At the time the petition was filed, its principal office was at Salem, Mass. Petitioner's application for recognition of exemption under section 501(c)(3) was filed with the Internal Revenue Service under date of October 27, 1978. The Commissioner issued a final adverse ruling on December 12, 1980.

Since January 1, 1978, petitioner has provided a service through which libraries (public and private), commercial organizations, and others may centrally pay license fees for copying of certain copyrighted publications. Petitioner does not, itself, provide copies of documents; instead, it operates as a clearinghouse for licensing of copying and as a conduit for

---

[1]The jurisdictional requirements specified in sec. 7428, I.R.C. 1954, have been satisfied: petitioner is the organization whose exempt status is in issue; it has exhausted its administrative remedies; and this action was timely filed. Sec. 7428(b), I.R.C. 1954; see Rule 210(c), Tax Court Rules of Practice and Procedure.

the transfer of license fees to copyright holders. Publishers register with the Center and display a "Code" on the first page of each registered publication, which states the license fee (if any) for copying of that publication. The Center also publishes a list of license fees for pre–1978 publications, because these do not bear the first page codes. Petitioner's services are available only to users who register with it, though there is apparently no charge for registration.

Petitioner's operations are more fully explained in the following excerpt from its "Handbook for Libraries and Other Organizational Users Which Copy From Serials and Separates":

The Copyright Clearance Center, Inc., has been established as an independent, not-for-profit *centralized* mechanism whose use can obviate the need to obtain hundreds or thousands of individual licenses from publishers by libraries, library consortia, information-on-demand businesses, access services, and others needing the right to prepare photocopies beyond the limited extent otherwise permitted by the new law.[2] Existence of the Center does not in any way prevent publishers from continuing their normal permissions programs, or users from asking for them, but the Center's programs should also be of real benefit and convenience to publishers.

The initial planners of the Center were largely publishers, authors, information-center managers, librarians, and others in the technical, scientific, and medical areas—areas in which the photocopying of "articles" is already widespread and important. However, this planning always called for the services of the Center to be open to use by the publishers and users of all types of collections of short works (journals, magazines, newsletters, proceedings, symposia, etc.), including separates, and this is now the case operationally. Indeed, it is anticipated that, perhaps with some modifications, the Center will be able to accommodate works of all types, regardless of length. The Board of Directors and Advisory Committee of the new Center are broadly representative of authors, publishers, and document users.

\* \* \* \* \* \* \*

The Copyright Clearance Center, Inc., does not itself provide copies of documents. That is presently the role of the publishers themselves, of directly licensed or Center-using information businesses and other access services, of resource libraries, and of libraries and information services within organizations. It should also be clearly understood that payments through the Center are not required when the copy supplier (including an internal library) has direct licenses from the publishers to make its copies. To repeat, what the Center can and does do is to provide libraries and other organizations needing permission to make copies legally with a simple,

---

²Pub. L. 94–553, 90 Stat. 2541 (1976), discussed *infra* at p. 796.

centralized mechanism through which to report and to pay for this copying after it has been done, hence with no delay for those needing copies.

The costs of operating the Center's system (its Operations and Administrative Offices) *will be deducted from the publisher-stated copying payments received* \* \* \* through a processing charge periodically determined by the Center's Board of Directors, before copying revenues are transmitted quarterly to the serial publishers or authors. Because of the efficiency of the Center's system design, which maximizes computer processing, this internal handling cost will be small ($0.25 per article copy for 1978), and can be reduced considerably as the volume of reported copying increases. (Reports that handling costs will consume copying payments are therefore completely unfounded, especially since funds contributed by concerned parties will make it unnecessary to amortize the expenses involved in bringing the Center into full operation.)

The Center has also designed its systems, including reporting and payment options, to minimize the incremental internal operating expenses of user *organizations.*

In order to fully understand the nature of petitioner's organization and its operations, as well as the issues presented in this declaratory judgment proceeding, it is necessary to review the recent legislative activity in respect of title 17, U.S.C., entitled "Copyrights." In recognition of the technological and commercial changes which had taken place since the last previous revision of the copyright laws in 1909, a movement for general revision of those laws was given new life in 1955 with legislative appropriations for research and study of the major issues involved.[3] Although the first bills of this revision campaign were introduced in Congress in 1964,[4] it was not until October 19, 1976, that Pub. L. 94–553, 90 Stat. 2541, was signed into law, with most of its provisions effective January 1, 1978. 90 Stat. 2572.

Of particular relevance to the instant proceeding are sections 106 through 108 of revised title 17, U.S.C. Section 106 grants to the owner of a copyright the exclusive right, inter alia, "to reproduce the copyrighted work in copies." Sections 107 and 108 limit this right, however, by providing that neither the "fair use" of the copyrighted work (section 107) nor the nonsystematic or single-copy copying in specified circum-

---

[3]See H. Rept. 1476, 94th Cong., 2d Sess. 47 (1976).

[4]See Ringer, "First Thoughts on the Copyright Act of 1976," 22 N.Y.L. Sch. L. Rev. 477, 478 n. 4 (1976–1977).

stances by libraries and archives (section 108) constitutes an "infringement of copyright." The codification of the judicially created "fair use" doctrine in section 107 does not include a definition of that term, but the statute identifies several factors to be considered in making a determination in each case, such as the purpose and extent of the reproduction, the nature of the work, and the commercial effect of the reproduction on the copyrighted work.

The statute itself, as borne out by the legislative history, reveals an attempt to strike an equitable compromise between the seemingly irreconcilable concerns of publishers, on the one hand, and libraries, commercial users, and other "consumers" of publications, on the other hand.[5] With the ever-increasing access of libraries and businesses to photocopying equipment, publishers and authors feared an erosion of their traditional copyright protection if multiple copies of a publication could be made by the consumer rather than purchased from the publisher.[6] Conversely, there was a recognized need for a certain amount of copying for scholastic and archival purposes without the administrative and monetary costs which necessarily attend a requirement of *licensed* reproduction. Beyond these limited exceptions for specific purposes, Congress apparently foresaw licensing as the norm for reproduction done on a systematic basis or motivated by a commercial objective.[7] While the statute makes no mention of the nature of the envisioned licensing process, the Senate report states: "Concerning library photocopying practices not authorized by this legislation [i.e., the limitations on the copyright provided for in section 108], the committee recommends that workable clearance and licensing procedures be developed." S. Rept. 473, 94th Cong., 1st Sess. 71 (1975).[8]

---

[5]See, e.g., H. Rept. 1476, *supra* at 74.

[6]See Hearings on H.R. 2223, 94th Cong., 1st Sess. 220 (1975) (statement of Irwin Karp, Counsel, The Authors League of America).

[7]See S. Rept. 473, 94th Cong., 1st Sess. 67–68 (1975); H. Rept. 1476, *supra* at 75.

[8]See also H. Rept. 83, 90th Cong., 1st Sess. 33 (1967):

"we urge that those affected join together in an effort to establish a continuing understanding as to what constitutes mutually acceptable practices, and to work out means by which permissions for uses beyond fair use can be obtained easily, quickly, and at reasonable fees. Various proposals for some type of Government regulation over fair use and educational reproductions have been discussed since the hearings, but the committee believes that workable voluntary arrangements are distinctly preferable."

Against this background, the Association of American Publishers (AAP) incorporated petitioner in July of 1977 as a not-for-profit corporation. Petitioner's certificate of incorporation identifies three "exclusive purposes" for which it was formed:

i. To facilitate and encourage the reprographic or other reproduction by educational, library and research institutions and by other organizations and individuals of copyrighted literary works, including, without limitation, articles and other contributions to scientific, technical, medical and professional periodicals and other collective works and literary works of any other nature and in any other form.

ii. To provide procedures and facilities by which permissions or licenses to reproduce such material or portions thereof may be obtained from the copyright owners and through which license fees or other payments for such copying may be made to such copyright owners.

iii. To take such other actions which are incidental to or connected with or in advancement of the foregoing purposes, and, in general, to implement the recommendations of the Committee on the Judiciary of the United States Senate as contained in Report No. 94-473 that workable clearance and licensing procedures with respect to copyrighted material be voluntarily developed.

The certificate further provides that no part of the net earnings of petitioner shall inure to the benefit of "any member, director, officer of the Corporation or any private individual," except for reasonable compensation for services performed, and that none of the mentioned parties may share in the assets of the corporation upon dissolution. In the event of dissolution, the assets may be distributed only to a qualified section 501(c)(3) organization. The certificate also precludes petitioner from engaging in any substantial propaganda or lobbying activities, as well as participating in a political campaign.

Petitioner's bylaws, which were adopted on September 1, 1977, provide that, initially at least, the corporation will have no members, and that it will be governed by a self-perpetuat-

---

In addition, the committee stated in respect of unauthorized library copying (H. Rept. 83, *supra* at 36):

"Despite past efforts, reasonable arrangements involving a mutual understanding of what generally constitutes acceptable library practices, and providing workable clearance and licensing conditions, have not been achieved and are overdue. The committee urges all concerned to resume their efforts to reach an accommodation under which the needs of scholarship and the rights of authors would both be respected."

ing board of directors. Provision is made, however, for the appointment of a nonvoting advisory committee, including "representative publishers, authors, librarians, members of the scientific community and others interested in the creation and distribution of printed material," to make recommendations as to the structure of the board and as to whether there should be members of the corporation. The bylaws also state that no director, officer, employee, or representative of petitioner shall engage in any activity on behalf of the corporation which is not permitted for an organization exempt under section 501(c)(3). Specific authorization is given, however, for the payment to any director or officer "or entities which they are affiliated with or employed by, of their pro rata share of the fees paid to the Corporation by others on account of either the reprographic or other reproduction of copyrighted literary works or the granting of permissions or licenses to reproduce such materials."

Petitioner's officers and directors, as of October 27, 1978, were as follows:

| Name | Office | Affiliation |
| --- | --- | --- |
| Michael Harris | Chairman (Chief Executive Officer) and Director | Vice President, John Wiley & Sons, Inc. (Publisher of technical and scientific journals) |
| H. William Koch | Vice Chairman and Director | Director, American Institute of Physics |
| David P. Waite | President (Chief Operating Officer) | Formerly President of Information Dynamics Corp. (systems engineering) |
| Ben H. Weil | Vice President, Secretary and Director | Senior Staff Adviser, Exxon Research & Engineering Co. |
| James Barsky | Treasurer and Director | President Academic Press Inc. (publisher of technical and scientific journals) |
| Garth Hite | Director | Vice President, The Atlantic Monthly Press |
| William McElroy | Director | Chancellor, University of California at San Diego |

| Name | Office | Affiliation |
|------|--------|-------------|
| Barbara W. Tuchman | Director | Author |
| Norman Garmezy | Director | Professor of Psychology, University of Minnesota |

When the application for exempt status was filed in October of 1978, there was no direct relationship between petitioner and the AAP. Nevertheless, the Technical, Scientific and Medical (TSM) division of that organization had helped to provide the impetus for the establishment of a "photocopy clearance mechanism" (i.e., petitioner), and a TSM task force did the initial solicitation of funds on petitioner's behalf. Although petitioner was designed to be self-supporting once it reached a sufficient transaction level, its initial projected expenses (in the amount of some $200,000) were financed by outright contributions and to a lesser extent by license fees which petitioner was permitted to retain by permission of some publishers. A solicitation communication[9] to TSM members pointed out the danger of "compulsory licensing at fees set by a government tribunal" unless petitioner could operate to "provide an orderly process for licensing, and the payment and collection of fees for photocopying." In respect of the desired contribution, the letter stated:

I urge you to ask your company or society to help to fund the remaining development of the Copyright Clearance Center NOW through a contribution, which is deductible as a business expense. The amounts suggested are naturally dependent on the size and type of company or society, and, particularly for TSM journal publishers, the number of journals published. For those who publish a substantial number of journals or whose revenues from journals are substantial, a range of $5,000 to $10,000 is suggested. Others are asked to contribute in accordance with their own circumstances.

A separate solicitation letter on petitioner's behalf, this one from the president of the AAP to the heads of unspecified publishing houses (Heads of Houses), similarly stressed the possibility of Government regulation in the absence of a clearinghouse mechanism. Such regulation, it was pointed out, could involve "minimal" royalty fees set by a Government tribunal, in contrast to the AAP-sponsored Copyright Clear-

---

[9]This solicitation and two others in the record were on the stationery of the Association of American Publishers, Inc., and although two of them were in the form of a "memorandum," each will be referred to herein as a "letter." Several other solicitation letters in the record are on the stationery of petitioner.

ance Center, where the "key element * * * is the right of each individual publisher to establish his own royalty fee." This letter, however, also identified several potential problems that "large-scale users of technical, scientific and medical articles" would face without this mechanism: the negotiation of separate license agreements with hundreds of journal publishers, the unavailability of materials needed for research, and possibly even litigation resulting from illegal photocopying. In this letter, it was stated that "the entire AAP membership has a stake in the success of this effort, and that each company in AAP should consider a contribution." Such solicitation was made of the entire AAP membership, on the theory that petitioner's focus on technical journals would be regarded as a "pilot operation," with potential applicability for other segments of the publishing community. Requested contributions from non-journal publishers were smaller, with the "largest contributions * * * expected from the parties with the largest and most direct interest—namely, the commercial journal publishers, the nonprofit journal publishers (professional societies) and the major corporate users."

In a form solicitation letter dated July 20, 1978, approximately 1 year after his initial letter, the AAP's president again requested contributions from AAP members to finance petitioner's startup expenses. The letter states:

The Center, an independent non-profit corporation, bears primary responsibility for this effort, and will be soliciting assistance from a wide variety of business corporations and non-profit publishers outside AAP. The AAP fundraising effort is addressed to its own members.

* * * While I am reluctant to ask you for additional help so soon after your earlier contribution, the problem is an urgent one involving *issues that bear upon the root interests of publishers. I therefore ask you, as a matter of direct self-interest, to consider a second contribution of roughly the same amount as the first.* [Emphasis supplied.]

The administrative record does not disclose whether petitioner reached its contribution goal of $200,000, although $140,000 was raised by the end of 1977. The record is also unclear as to the amount contributed by commercial publishers; however, a June 30, 1978, list of "substantial contributors" reveals total contributions of $37,727 from four commercial publishers. In addition, the following amounts were received from other groups (as of September 30, 1978):

Scientific and professional societies (22) .......... $34,450
Commercial users (3) ................................... 13,000
University presses (7) ................................ 10,750
  Total ................................................ 58,200

Aside from these contributions to cover initial expenses, petitioner's operating revenues are derived solely from the charge it deducts from each license fee collected. While the fee paid by the user is determined solely by the copyright owner, the Center's charge is set at whatever level is necessary to cover its operating and administrative expenses. Users are not required to report copying which is exempted under sections 107 and 108 of title 17, U.S.C., or copying for which no license fee is charged, and the Center does not generally process such transactions because they yield no revenue to cover its expenses and the information is not readily available.

Petitioner's services are used by both commercial and not-for-profit organizations. As of June 30, 1979, there were 269 commercial and 286 not-for-profit organizations registered. Similarly, the publishers registered with petitioner are a heterogeneous group in this respect, as 45 percent are not-for-profit and 55 percent are commercial. In addition, the copying fee for approximately 11 percent of the publications is 25 cents or less, resulting in no financial return to the publisher.

In two letters in the record, Barbara Ringer, then the Register of Copyrights of the U.S. Copyright Office, expressed her views in respect of the public interests served by petitioner. A representative excerpt from one of the letters is set forth as follows:

There is little question that the existence of the Copyright Clearance Center has made it easier for libraries, educational institutions, and other users to comply with the new copyright law, while at the same time assuring authors and publishers of copyrighted materials the compensation to which they are entitled under the law for the use of the products of their creativity. The Center has had some of the problems that any new activity of this nature experiences in its initial development, but they are certainly not fundamental, and I look on them as growing pains. The CCC's fundamental purpose—to serve the public—is being realized, and the public would be hurt seriously if the CCC ceased to function. All those who depend upon the availability of materials from libraries and information centers benefit from the existence and activity of the Copyright Clearance Center. It is an operation very much in the public interest.

In the notification of his final adverse determination on petitioner's exempt status under section 501(c)(3), the Commissioner stated:

A donative element has not been established by your organization. Any public benefits from your activity are subordinate to your primary purpose of furthering the economic interest of publishers and copyright owners. The fact that your activities support a business purpose serving publishers and copyright owners is a strong indication that your activities are not charitable, as required by the Code and regulations.

On brief, the Government has transformed this rationale into three separate reasons for denying petitioner's request for exempt status: (1) Petitioner is not organized for any of the exempt purposes enumerated in section 501(c)(3); (2) petitioner is not operated for any of these same purposes; and (3) petitioner is organized and operated for nonexempt purposes which constitute more than an insubstantial part of its activities.

Petitioner may qualify for exemption from income taxation under sections 501(a) and 501(c)(3) only if it is organized and operated "exclusively" for one or more of the exempt purposes specified in section 501(c)(3). Sec. 1.501(c)(3)–1(a)(1), Income Tax Regs. Thus, qualification requires that petitioner meet a two-part test: (1) Its "articles of organization" must limit petitioner to one or more exempt purposes, and not authorize substantial activities not in furtherance of such purpose or purposes; and (2) it must not engage, other than in insubstantial part, in activities which do not further an exempt purpose. Sec. 1.501(c)(3)–1(b) and 1(c), Income Tax Regs. These are known, respectively, as the "organizational" and "operational" tests. In respect of the latter, "the purpose towards which an organization's activities are directed, and not the nature of the activities themselves, is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization." *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 356–357 (1978). See also *est of Hawaii, Inc. v. Commissioner*, 71 T.C. 1067, 1078–1079 (1979), affd. 647 F.2d 170 (9th Cir. 1981).

Although an organization might be engaged in a single activity, such activity may be directed toward multiple purposes, both exempt and nonexempt. But, in the case of multiple purposes, it must be kept in mind that qualification for exemption depends upon whether the entity in question is organized and operated "exclusively" for one or more of the

exempt purposes specified in the statute. While it is true that the word "exclusively" has not been given a literal interpretation, and that a nonexempt purpose even perhaps somewhat beyond a de minimis level has been permitted without loss of exemption,[10] it is nevertheless plain that the word "exclusively" places a definite limit on the "purpose" at issue. And that limit has been clearly articulated by the Supreme Court in *Better Business Bureau v. United States*, 326 U.S. 279 (1945), as follows (p. 283): [11]

the presence of a single [nonexempt] * * * purpose, *if substantial in nature*, will destroy the exemption regardless of the number or importance of truly [exempt] * * * purposes. [Emphasis supplied.]

We are, of course, aware that in some cases the test has been restated in terms of "whether an organization's *primary* purpose is exempt or nonexempt." (Emphasis supplied.) See *est of Hawaii, Inc. v. Commissioner*, 71 T.C. 1067, 1079 (1979), affd. 647 F.2d 170 (9th Cir. 1981); cf. *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 357 n. 2 (1978). However, regardless of whether any real differences may be thought to exist between these two formulations,[12] we are obviously bound by the Supreme Court's authoritative exposition, and will proceed to consider whether, in the language of the Supreme Court, there is present here a disqualifying nonexempt purpose that is "*substantial* in nature." In our judgment, there is present in this case a disqualifying nonexempt purpose that is substantial

---

[10]See, e.g., *St. Louis Union Trust Co. v. United States*, 374 F.2d 427, 431 (8th Cir. 1967); *Dulles v. Johnson*, 273 F.2d 362, 368 (2d Cir. 1959), cert. denied 364 U.S. 834 (1960); *Seasongood v. Commissioner*, 227 F.2d 907, 910 (6th Cir. 1955); *Kentucky Bar Foundation v. Commissioner*, 78 T.C. 921, 923 (1982); *Greater United Navajo Development Enterprises, Inc. v. Commissioner*, 74 T.C. 69, 77–78 (1980), affd. 672 F.2d 922 (9th Cir. 1981); *Church in Boston v. Commissioner*, 71 T.C. 102, 107 (1978).

[11]To be sure, *Better Business Bureau* dealt with social security taxes, but the statutory language in that case is comparable to the critical language of sec. 501 involved herein, and the test thus announced in that case has been regarded as applicable to the issue before us. Cf. *Syrang Aero Club, Inc. v. Commissioner*, 73 T.C. 717, 722–723 (1980); *Dumaine Farms v. Commissioner*, 73 T.C. 650, 668 (1980); *est of Hawaii v. Commissioner*, 71 T.C. 1067, 1079 (1979), affd. 647 F.2d 170 (9th Cir. 1981); *Christian Manner International v. Commissioner*, 71 T.C. 661, 667–668 (1979); *Christian Stewardship Assistance, Inc. v. Commissioner*, 70 T.C. 1037, 1040 (1978); *Virginia Professional Standards v. Blumenthal*, 466 F. Supp. 1164, 1169 (D. D.C. 1979), appeal dismissed No. 79–1501 (D.C. Cir., Aug. 13, 1979); *Fides Publishers Ass'n v. United States*, 263 F. Supp. 924, 934–935 (N.D. Ind. 1967).

[12]Cf. *est of Hawaii, Inc. v. Commissioner, supra* at 1079.

in nature and we therefore need not consider any of the Government's alternative contentions.

Petitioner presses upon us with considerable vigor its contentions that it is a qualifying charitable organization, that it promotes social welfare by creating and operating channels of communication necessary to implement the copyright clause of the Constitution and the 1976 Copyrights Act and serves a governmental or quasi-gove mmental function, and that it promotes education and science—all exempt or charitable functions. While we do not neces arily agree with all of these contentions, certainly not in every detail, we are thoroughly satisfied that petitioner serves to a substantial degree one or more exempt purposes. The extensive and able presentation by petitioner's counsel leaves no doubt in our mind as to this conclusion. But that is not the end of the matter, for, as pointed out above, the existence of a substantial nonqualifying purpose is fatal to the claimed exemption "regardless of the number or importance of truly [exempt] * * * purposes." *Better Business Bureau v. United States, supra.* And, we are convinced on this record that there is here a substantial nonqualifying purpose.

We are not faced here with a truly joint undertaking of all parties—publishers, copyright owners, users, and governmental agency—concerned with proper enforcement of the copyright laws, in which efforts are focused on meeting the needs and objectives of all involved. Instead, petitioner was organized by a segment of a publishers' trade group, the Technical, Scientific, and Medical division of the AAP, and there is little persuasive evidence that petitioner's founders had interests of any substance beyond the creation of a device to protect their copyright ownership and collect license fees. Cf. *North American Sequential Sweepstakes v. Commissioner,* 77 T.C. 1087, 1094–1095 (1981). For example, the solicitation letters in the administrative record are almost entirely of a single dimension in their appeal for funds. The letters point out that in the absence of a clearinghouse mechanism there would be a danger of Government licensing, a system which the publishers apparently feared, because it would be compulsory and might result in "minimal royalty fees set by a government tribunal." Such possible unfavorable eventuality was contrasted with the "key element in the AAP Copyright Clearance

Center [which] is the right of each individual publisher to establish his own royalty fee for each article he publishes." Furthermore, of at least equal significance is the fact that the amount of the contribution requested in the letters varies directly with the particular publisher's prospects for license revenue from an operative clearinghouse. The AAP's president put the entire matter most bluntly in his 1978 letter: "I therefore ask you, as a matter of direct self-interest, to consider a second contribution."

It is certainly not unexpected that letters soliciting contributions for petitioner would emphasize the interest of the donor in petitioner's success. Nevertheless, the letters in the record are so one-sided in language and tone that we cannot accept petitioner's contention that the letters simply "puff" the financial benefit to publishers. Aside from a passing reference in one letter to the benefits of the clearinghouse for users of copyrighted material, the focus of the solicitation campaign is clearly on "issues that bear upon the root interests of publishers." See p. 801 *supra*. Moreover, the administrative record is devoid of solicitation letters sent to users or other interested parties unrelated to the publishers, and we do not find any other convincing evidence suggestive of a substantial charitable purpose motivating the founders of petitioner. In short, we are satisfied on the record before us that, of the three organizational purposes enumerated in petitioner's certificate of incorporation, petitioner's founders were preoccupied with the second: "To provide procedures and facilities by which permissions or licenses to reproduce such material or portions thereof may be obtained from the copyright owners and *through which license fees or other payments for such copying may be made to such copyright owners*." (Emphasis supplied.)

˙ We recognize that the mere fact that a certain group derives a financial benefit from an organization's activities may not be sufficient to disqualify the organization under section 501(c)(3). For example, in *Goldsboro Art League, Inc. v. Commissioner*, 75 T.C. 337 (1980), the organization in question operated an art center which furnished various educational and charitable services for the community which were indisputably of an exempt character. As an incident to its overall activities, it operated two art galleries which invited artists to submit their works for exhibition and possible sale. Only those art works

selected by a jury to insure artistic quality and integrity were thus exhibited, and the artists received the proceeds of any sales after deduction of a 20-percent commission. In holding that the organization was exempt, the Court emphasized that the artistic pieces were selected for exhibition by a jury, on the basis of "representation of modern trends" rather than salability, and that the "sales activities [were] * * * incidental to its other activities and serve[d] the same overall objective of art education." 75 T.C. at 344–345.

In contrast, in the instant case we are unable to find such a clear separation of an indisputably charitable purpose and an incidental private benefit. Instead, it appears that the potential for a substantial private profit was the driving force behind the organization and operation of the Center. Petitioner contends that it has "other copyright functions and purposes," including maintaining and distributing its coding system and publicizing legal rights and duties under title 17, U.S.C., but these activities are merely ancillary to the goal of profitable exploitation of copyrights and minimizing infringement, and they fall far short of establishing an independent charitable purpose. Cf. *Ann Arbor Dog Training Club v. Commissioner*, 74 T.C. 207, 212 (1980).

We reach this conclusion notwithstanding that our review of the administrative record, as well as the legislative history of Pub. L. 94–553, leaves little doubt of the existence of a connection between sections 106 through 108 of revised title 17, U.S.C., and the operation of a clearinghouse mechanism. The success of the compromise struck in the limitation provisions of sections 107 and 108 depends in large part on compliance with section 106 for all copying which is within the area of protection afforded to the copyright holder. Moreover, both Congress and the Register of Copyrights apparently recognized the need for procedures for licensed copying on a large scale, without which enforcement of the copyright protection granted in section 106 would be at best costly and complex, and perhaps even impossible.

Petitioner relies heavily on the considerations just outlined, which persuasively establish the benefit of a clearinghouse mechanism to the effective operation of the new copyright statute. And petitioner would certainly have a strong case if the profit objective of the publishers represented only a minor

or incidental purpose of its organization and operation. Indeed, there is a well-recognized line of cases holding that where the nonexempt purpose is merely incidental to an exempt or qualifying purpose, such incidental nonexempt purpose will not defeat qualification under section 501(c)(3). See, e.g., *Kentucky Bar Foundation, Inc. v. Commissioner,* 78 T.C. 921, 926, 929 (1982), on appeal (6th Cir., Sept. 10, 1982); *St. Louis Union Trust Co. v. United States,* 374 F.2d 427, 436 (8th Cir. 1967); see also *Professional Standards Review v. Commissioner,* 74 T.C. 240, 249 (1980); *Virginia Professional Standards v. Blumenthal,* 466 F. Supp. 1164, 1173 (D. D.C. 1979), appeal dismissed No. 79–1501 (D.C. Cir., Aug. 13, 1979). The matter is largely factual. Our finding in the present case is that the nonexempt purpose was not incidental. It represented the dominant and overriding concern of those who organized, sponsored, and promoted petitioner. The situation here is sharply distinguishable, for example, from *Kentucky Bar Foundation,* where the perceived financial benefits to the legal profession were thought to be of only relatively minor consequence in respect of the basic exempt objectives of the organization. The Court there found that any economic benefits flowing to attorneys were merely incidental to, or an insignificant part of, the charitable purpose served. 78 T.C. at 926, 929–930.

In this case, on the other hand, the financial benefits to the publishers are much more direct and substantial. In *Kentucky Bar Foundation,* the economic benefits to the bar members were termed "occasional" (in respect of a lawyer referral service, 78 T.C. at 926), and "intangible" (in respect of a fee arbitration plan, 78 T.C. at 929). In contrast, the financial benefits to publishers from petitioner's operations are not only frequent and concrete, but also potentially of considerable magnitude. Although the record does not include evidence of petitioner's revenues or remittances to publishers for any extended period, a 1978 draft solicitation letter discloses that September 1978 gross permission fees were $17,000, based on 10,375 copies reported. Moreover, the letter states that the latter figure was only about 2 percent of estimated monthly photocopying activity of U.S. libraries that would require permission from copyright owners. It is apparent, then, that publishers could foresee the possibility of substantial license

revenues from libraries, alone, in addition to amounts which might be received from corporations and other users of petitioner's services. This benefit is certainly not "insubstantial," nor in our view is it incidental to any exempt purposes served by petitioner. Cf. *Incorporated Trustees of the Gospel Worker Society v. United States*, 510 F. Supp. 374, 378 (D. D.C. 1981), affd. 672 F.2d 894 (D.C. Cir. 1981), cert. denied 456 U.S. 944 (1982).

We are also not persuaded of charitable motives on the part of petitioner's founders by the statistics cited in respect of not-for-profit registrants, both users and publishers. The bare fact that approximately half of each group is composed of not-for-profit organizations does not compel the conclusion that there is absent a substantial nonexempt purpose. Simple subtraction leaves a remainder of half of the publishers reaping profits from fees collected from all of the users, not-for-profit as well as commercial. And this result is little changed by the 11 percent of publications for which licensing brings no immediate financial return to the publisher. This figure is relatively insignificant, and in any event, the decision to charge a minimal fee does not necessarily denote altruism, for the publishers concerned may anticipate future benefits from wider dissemination of their publications through photocopying. Moreover, the Center, itself, does not process transactions unless a fee is charged to cover its expenses.[13] Thus, all costs of the Center are, in effect, borne by libraries, commercial users, and other licensees, and publishers benefit financially from a very substantial percentage of the transactions. In our view, these statistics offer little in the way of support for petitioner's claim to exempt status under section 501(c)(3).

In the context of the dominant objectives of petitioner's founders and the obviously anticipated substantial economic benefits, it is entirely irrelevant that the Register of Copyrights viewed petitioner from a different perspective, without any apparently serious or appreciable concern for the purpose that we have found to have in fact motivated the establishment of petitioner by its organizers. We have read the two

---

[13]In this respect, petitioner falls outside the category of organizations which provide some services free, or at least below cost. See *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 360 (1978).

letters in the record by the former Register of Copyrights, and find that notwithstanding the public importance which she attached to petitioner's operations, her views in no way diminish the substantiality of the nonexempt purpose that we have found to coexist here. Petitioner simply does not pass the test articulated in *Better Business Bureau*.[14]

*Decision will be entered for the respondent.*

---

[14]Petitioner has also attempted unsuccessfully to have the administrative record reopened so that it might reflect the views of the current Register of Copyrights. A letter written by that official to the Chief Judge of this Court was returned to him. However, petitioner's counsel have reproduced that letter in an appendix to their brief, and we have read it. It is either cumulative of views expressed by his predecessor or deals with materials that may be thought to be of consequence to the public service performed by petitioner, but it does not affect our conclusion as to the existence of a substantial nonexempt purpose notwithstanding the coexistence of one or more "truly" exempt purposes.