## LINWOOD CEMETERY ASSOCIATION, AN IOWA NON-PROFIT CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3093-86X.          Filed December 17, 1986.

---

*Brian J. Kane*, for the petitioner.
*Judith M. Picken*, for the respondent.

OPINION

RAUM, *Judge*: The Commissioner determined that petitioner does not qualify for exemption from income taxation as an organization described in section 501(c)(3), I.R.C. 1954. Petitioner has invoked the jurisdiction of this Court to obtain a declaratory judgment as to its exempt status under section 501(c)(3). [1] The question presented is whether petitioner is operated exclusively for charitable purposes within the meaning of section 501(c)(3), I.R.C. 1954.

The case was submitted on the basis of the stipulated administrative record, which is incorporated herein by reference. The factual representations in the administrative record are accepted as true. Rule 217(b), Tax Court Rules of Practice and Procedure.

The Linwood Cemetery Association (hereinafter petitioner, Linwood, or the association) is an Iowa nonprofit corporation with its office located in Dubuque, Iowa. It was originally incorporated on August 25, 1875. It filed restated articles of incorporation on November 19, 1976, when it elected to "voluntarily adopt the provisions of the Iowa Nonprofit Corporation Act." The association was granted tax-exempt status on April 10, 1942, under the predecessor of section 501(c)(13), I.R.C. 1954. Its status under section 501(c)(13) is not now at issue.[2] Petitioner filed with the Internal Revenue Service a Form 1023 "Application for Recognition of Exemption Under Section 501(c)(3)" dated

---

[1] The jurisdictional requirements specified in sec. 7428, I.R.C. 1954, have been satisfied; petitioner is the organization whose exempt status is in issue; it has exhausted its administrative remedies; and this action was timely filed. Sec. 7428(b), I.R.C. 1954; see Rule 210(c), Tax Court Rules of Practice and Procedure.

[2] Sec. 501(c)(13) confers exempt status upon cemetery companies which meet one of three following independent requirements:

(1) "owned and operated exclusively for the benefit of their members;" (2) "not operated for profit;" or (3) "chartered solely for the purpose of the disposal of bodies by burial or cremation which is not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

See *Rockefeller Family Cemetery Corp. v. Commissioner*, 63 T.C. 355, 358 (1974); *Washington Park Cemetery Association, Inc. v. Commissioner*, T.C. Memo. 1963-268.

March 9, 1984.[3] The Commissioner issued a final adverse determination on December 30, 1985. The petition for declaratory judgment (exempt organization) was filed with this Court on February 3, 1986.

Linwood Cemetery Association was founded in 1875 in order to deal with the problem of the unsatisfactory state of the burial grounds existing at that time in Dubuque, Iowa (the city or Dubuque). By the time the association was founded, the city had established a cemetery on the present site of the Linwood Cemetery, a site removed from the city. This cemetery replaced one located in the center of town that had fallen into disrepair and became the scene of street arguments and "disrespect of the dead". Under the city's care, the cemetery that had been established on the Linwood site in turn fell into disrepair. It became overgrown with brush, weeds, briers, and bramble. There were no suitable pathways through it and monuments were hidden from view.

The Linwood Cemetery Association was founded by 19 prominent citizens of Dubuque who raised $60,000 in stock subscriptions from 113 investors. They incorporated the association and "pushed the City Council to [hold] a citywide vote in October, 1875," on the issue of the management of Linwood Cemetery. The result of that vote, held on October 1, 1875, was that "the legal and certified voters of the City of Dubuque did * * * by a majority of all the votes cast, vote in favor of selling the lands owned by the City used and known as Linwood Cemetery" to the association. The vote was 697 for and 308 against such sale.

The cemetery property extending over some 39 acres was sold by the city to the association by deed dated October 7, 1875. As consideration for the sale, the city received "One Dollar" and imposed on the association the "covenants and conditions" set out in the deed. Relevant portions of the conditions of the sale found in the deed are as follows:

---

[3]Petitioner seeks tax-exempt status under sec. 501(c)(3), I.R.C. 1954, in order to assure that bequests made to Linwood will be deductible from the donor's gross estate under sec. 2055(a)(2). Although sec. 170(c)(5), I.R.C. 1954, provides for a deduction for income tax purposes in the case of a contribution by an individual to a "cemetery company", no such parallel provision exists for estate tax purposes in respect of such contributions. See *Child v. United States*, 540 F.2d 579, 581-582 (2d Cir. 1976), cert. denied 429 U.S. 1092 (1977).

1st The Conveyance is made subject to all lots that have already been conveyed in said premises.

2d The said Grantees herein agree and bind themselves to take charge in place of the City of the entire Cemetery conveyed, to keep the same in proper order and condition; to keep down weeds brush, and brambles on all unsold ground; to furnish Sexton; to keep up and maintain a proper fence around the Cemetery grounds with the necessary gates for ingress and egress * * * .

3rd As to the Potters field, * * * the Grantees herein agree to retain the same for the same purpose, or to furnish elsewhere in the old cemetery, or on the land bought by the Grantees for the New Cemetery, an equal amount of land for said Potters field and at such time as more land may be required for a Potters field the said Grantees agree to furnish the same to the Cemetery free of charge, or at some other proper location convenient to the City and satisfactory to the City Council. And no cost or expense shall be charged to the City for digging a grave for or taking charge of the burial of any corpse in the said Potters field.

4th The Lots already sold in the lands hereby conveyed are in no wise to be disturbed or interfered with by the Grantees except by the consent of such lot owners, and the Grantees agree to take as good care of the said lots now sold as the City has heretofore done * * * .

5th No change of grade shall be made upon any avenue, road or alley of said present Cemetery where any lots have been sold and interments made therein abutting thereon, except by consent of at least two thirds (2/3) of such lot owners * * * .

6th The City agrees to grant to the Grantees the privilege of laying out additional Cemetery Grounds immediately North and East of the present Cemetery not exceeding three hundred acres of land. The prices which Grantees may charge for digging graves shall be Cincinnati Schedule prices: provided that for digging and enclosing an ordinary grave without walling or planking no more than three dollars shall be charged.

7th The Grantees agree to sell lots in the Cemetery as follows: 1/20th of the lots at a rate of not over ten cents per square surface foot and 1/20th at a rate not over twenty cents per square surface foot and any land that may be added by the Grantees to the Cemetery land conveyed lots shall be sold 1/20 at ten and 1/20th at not over twenty cents per square surface foot.

8th The public to have the privilege of going into the Cemetery at all reasonable hours subject to such reasonable rules and regulations as the Grantees may adopt but never, however, to be charged any entrance fee.

9th The Grantees shall provide a Sexton who shall be present at all burials and assist at the same without expense to lot owners. He shall keep a record of all burials with the name and age of the deceased if known and also of the disease that caused the death if known. * * *

The deed further provided that "Any intentional failure on the part of the Grantees to substantially perform and carry out the foregoing conditions shall work a forfeiture of

this conveyance to the City of Dubuque with all improvements made thereon". There is no longer a city-run cemetery in Dubuque, Iowa.

Relying on the circumstances of its origin and the covenants and conditions contained in the above deed, Linwood considers itself to be "an outgrowth of the City of Dubuque".

The cemetery run by Linwood is a fully operational cemetery, which conducts an average of 150 burials per year and is located on approximately 140 acres of property, substantially in excess of the 39 acres on which the cemetery was operated when it was conveyed to the association in 1875. Its location provides it with space on which to operate "for at least 1,000 more years." Linwood's restated articles of incorporation outline "The purpose or purposes for which the corporation is organized" as follows: "to operate, conduct and maintain in or near the City of Dubuque, Iowa a cemetery or cemeteries for the interment of the dead". Petitioner's Form 1023, application for recognition of exemption, contains the following description of the activities it carries on:

Linwood serves a community need by operating a non-profit cemetery which sells land (plots), mausoleum crypts and memorials. Linwood also provides perpetual care services, special care and free burial to indigents of the City and County of Dubuque as well as to Veterans.

The services it furnishes are further described in an affidavit filed in the administrative record by the general manager of the association as follows:

1. Does not deny burial to any person on account of race, creed, color or ethnic origin;
2. Provides free burial *space* for all honorably discharged veterans [emphasis supplied];
3. Provides a "potters field" or county section and furnishes *space* for all indigents *to be buried free of charge* [emphasis supplied];
4. Provides an average of 150 burials per year;
5. Sells land, mausoleum crypts and memorials;
6. Provides perpetual care;
7. Places Christmas wreaths in Cemetery at Christmastime;
8. Provides special care which includes planting of flowers on property owners lots and trimming of schrubs [sic];
9. Plats [sic] flower beds throughout the Cemetery for beautification during the season;

10. Transports elderly people to the Cemetery upon request for visitation;

11. Provides tours for school groups which are guided by Linwood personnel who explain points of interest;

12. Promotes and allows the Bird Watchers Association to meet periodically throughout the season at the Cemetery;

13. Provides school children with information for school and community studies;

14. Provides information for the Genealogy Society;

15. Provides Memorial Day services for the public with speakers, bank [sic] and memorial service;

16. Provides the Avenue of Flags flown for the public on Memorial Day weekend, Flag Day and the Fourth of July;

17. Provides small flags for persons to place on Veterans graves; and

18. Provides families throughout the Dubuque area with a booklet called the "Family Emergency Portfolio Guide" to help eliminate hardship at time of death (these are delivered to families and explained free of charge before tragedies occur in their homes).

In the years 1980 through 1983, the number of free burials[4] and total burials conducted at Linwood Cemetery each year is as follows:

|  | 1980 | 1981 | 1982 | 1983 | 1980-83 |
|---|---|---|---|---|---|
| Free burials | 91 | 77 | 71 | 79 | 318 |
| Paid Do. | 59 | 88 | 72 | 73 | 292 |
| Total Do. | 150 | 165 | 143 | 152 | 610 |

The percentage of total burials which were free burials in 1980, 1981, 1982, and 1983 is 60.66 percent, 46.66 percent, 49.65 percent, and 51.97 percent, respectively. Overall, in the 4 years, free burials constituted just over half (52.13 percent) of total burials.

The association's restated articles of incorporation provide that "No part of the net earnings of the corporation shall inure to the benefit of or be distributable to directors, officers, or other private persons, except that the corporation shall be authorized to pay reasonable compensation for services rendered, and to make payments and distributions in furtherance of its purposes". The articles further provide

[4]It is unclear from the record whether this "free burials" category includes burials in which only the burial space is provided free of charge or whether it includes burials in which both the space, interment, and associated services are provided free of charge. The limiting language of the above affidavit (at numbers 2 and 3) and similar language in another exhibit in the administrative record raise troubling doubts in this connection, especially with respect to the "free burial" of veterans. Further, while the Government pointed out this ambiguity in its opening brief, petitioner made no effort, in its reply brief, to clarify the situation.

that "No substantial part of the activities of the corporation shall be carrying on of propaganda or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of any candidate for public office". Additionally, the association is expressly prohibited from "carry[ing] on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under Section 501(c)(3) * * * or (b) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1954". On "dissolution of the corporation", its board of directors is instructed to pay the corporation's liabilities and then "dispose of all the assets of the corporation exclusively for the purpose of the corporation in such manner, or to such organization or organizations, organized and operated exclusively for charitable, educational, religious or scientific purposes as shall at the time qualify as an exempt organization or organizations under Section 501(c)(3) of the Internal Revenue Code of 1954".

The association's bylaws provide that "The corporation shall have no members". They provide for a 12-member board of directors and a president, secretary, recording secretary, treasurer, and general manager.[5] Provision is made for an executive committee to manage the affairs of the corporation and for two standing committees which are the committee of sales and the committee of finance and audit.

In its application for recognition of exemption, Linwood represented that its "largest source of financial support results from the operation, conduct and maintenance of the non-profit cemetery". The source and amount of petitioner's gross revenues for the years 1980 through 1983 are as follows:

|  | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|
| Operations | $176,325.49 | $191,880.41 | $210,827.40 | $165,847.62 |
| Investments | 40,384.19 | 44,394.89 | 58,676.86 | 54,770.09 |
| Gifts | 6,495.00 | 3,906.12 | 2,794.36 | 3,365.00 |
| Total revenues | 223,204.68 | 240,181.42 | 272,298.62 | 223,982.71 |

---

[5]How the board of directors and the officers are selected is not clear from the record.

Revenues from operations comprised 79 percent, 79.89 percent, 77.43 percent, and 74.05 percent of total gross revenues in 1980, 1981, 1982, and 1983, respectively, while revenues from gifts comprised only 2.91 percent, 1.63 percent, 1.03 percent, and 1.5 percent of total revenues in those same years.

The gifts received were made, at least in part, in response to Linwood's annual Christmas solicitation for financial support. That solicitation states that "For many, Linwood is more than a cemetery and is an integral part of Dubuque and its proud heritage" and that "your help however remains increasingly vital". It asks the potential donor to "be a part of [the Linwood] heritage".

The association's bylaws provide for the maintenance of a "General Operating Account", an "Account for Non-Restrictive Funds" supplied by the deposit of investment assets, and three special purpose trusts. The special purpose trusts include a "Perpetual Care Fund Trust" funded by "Twenty percent (20%) of all land and marker sales" and a "Special Care Fund Trust" endowed by "special donations". Both the funds supplied to the Perpetual Care and those supplied to the Special Care Fund Trusts are shown on Linwood's income statements for 1980 through 1983 as "Income Reserves" offset against "Income-Operations". The final special trust provided for in the bylaws is the "Ella B. Ruete Memorial Trust Fund" to which expenses for the upkeep of two particular grave areas are charged. In the years 1980 through 1983, these three funds were carried on petitioner's balance sheets in amounts ranging from $438,402 to $468,181 and they produced "Investment Income" in amounts ranging from $35,559 to $50,445.52. Total association assets[6] in those years ranged from $715,955 to $1,094,705.[7]

Expenditures made by Linwood in 1980 through 1983 consisted of its cost of sales and the operating expenses (wages, commissions, utilities, advertising, taxes) typical of an ordinary business. Its expenses which are attributable to

---

[6]Petitioner carried the cemetery land on its books at its cost of $1.

[7]In 1980, 1981, and 1982 total assets were $733,333.49, $715,955.29, and $768,873.81. Only in 1983, with the appearance of a "Memorial Chapel Fund" did assets reach over $1 million.

"free burial" of indigents and veterans are not segregated from those attributable to other burials.

The sums allocable to the above described items of income and expense are set forth in the following summary based upon petitioner's income statements for the years 1980 through 1983:

| | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|
| Revenue: | | | | |
| Operations and gifts | $182,820.49 | $195,786.53 | $213,621.76 | $169,212.62 |
| Less: | | | | |
| Special trust reserve | 14,638.00 | 13,444.60 | 16,916.20 | 12,687.97 |
| Cost of sales | 34,735.34 | 43,588.46 | 36,533.58 | 34,288.36 |
| Gross profit | 133,447.15 | 138,753.47 | 160,171.98 | 122,236.29 |
| Less: | | | | |
| Operating expenses | 155,129.91 | 173,365.86 | 185,643.65 | 166,582.18 |
| Operating income | (21,682.76) | (34,612.39) | (25,471.67) | (44,345.89) |
| Investment and other income | 40,384.19 | 44,394.89 | 59,957.30 | 55,807.47 |
| Net income | 18,701.43 | 9,782.50 | 34,485.63 | 11,461.58 |

In the final adverse determination of petitioner's status under section 501(c)(3), the Commissioner simply stated, as the reason for the determination, that "The organization is not operating exclusively for the purposes under section 501(c)(3)". Petitioner contends that it is "operated exclusively for charitable purposes since the functions it performs, * * * would [otherwise] descend upon the public". The association also apparently relies on a characterization of its activities as pursued for "relief of the poor and distress[ed] or of the underprivileged" and to further "public health" in its argument for section 501(c)(3) status. These "relief of the poor" and "public health" bases for exempt status seem to be treated by petitioner as subsumed within its argument that its function would otherwise "descend upon the public."[8] Petitioner further asserts that it "is not denied charitable status simply because it charges for its services".[9]

---

[8] Our uncertainty with respect to the arguments made by petitioner in this Court is a result, in large part, of petitioner's having relied in its brief on "the arguments advanced by Linwood * * * in [unspecified portions of] the Administrative Record." While we do not look upon petitioner's mere reference to arguments made in the administrative record as a proper briefing of the issues, we have strained to consider all petitioner's arguments even if only vaguely alluded to on brief.

[9] In the administrative record, petitioner also makes an argument based on unconstitutionality under the Fifth Amendment of the distinction, for purposes of exemption, between church cemeteries and other nonprofit cemeteries. Petitioner does not mention that line of argument

As noted earlier herein, petitioner was granted an exemption from taxation in 1942 under the predecessor of section 501(c)(13) as a "cemetery company", and that exemption is not in controversy. It now seeks exemption also under the more rigid requirements of section 501(c)(3) as an entity "organized and operated exclusively for * * * charitable * * * purposes".[10] The Government contends initially in substance that the framework and legislative history of section 501 establish that, with some possible rare exceptions, section 501(c)(3) and section 501(c)(13) were intended to be mutually exclusive, and that petitioner as a section 501(c)(13) cemetery company is not eligible for classification as a "charitable" organization under section 501(c)(3). The argument in support of that position is strong, but we find it unnecessary to pass upon it because of our conclusion that petitioner in any event fails to qualify under section 501(c)(3).

The Commissioner argues that petitioner is more suited to classification under section 501(c)(13) than under section 501(c)(3), I.R.C. 1954, because the "association does not lessen the burdens of Government", its activities do "not amount to relief of the poor", and its "non-charitable functions are not merely incidental". The burden is on petitioner to show, based on the administrative record, that the Commissioner erred in his determination that Linwood is "not operating exclusively for the purposes under section 501(c)(3)". *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 356 (1978); *Hancock Academy of Savannah v. Commissioner*, 69 T.C. 488, 492 (1977).

Petitioner may qualify for exempt status under sections 501(a) and (c)(3) only if it is *"both* organized and operated

---

on brief. In any case, the argument must be rejected on the basis of *First National Bank of Omaha v. Commissioner*, 681 F.2d 534, 541 n. 5 (8th Cir. 1982), cert. denied 459 U.S. 1104 (1983).

[10]Although classification under sec. 501(c)(3) rather than under sec. 501(c)(13) would not improve its own tax-exempt status, it could enhance its funding position. To be sure, a contribution to a cemetery company like petitioner would probably be deductible by the donor for income tax purposes pursuant to sec. 170(c)(5), and petitioner's sec. 501(c)(13) exempt status would thus be just as useful to it in respect of inter vivos contributions as its desired exempt classification under sec. 501(c)(3). But the situation is sharply different in respect of testamentary bequests, because there is no corresponding provision in the Code granting estate tax deductions for gifts to "cemetery companies". See *Child v. United States*, 540 F.2d 579, 582 (2d Cir. 1976), cert. denied 429 U.S. 1092 (1977). However, if such companies could also qualify as being governed by sec. 501(c)(3), there would be a basis for an estate tax deduction under sec. 2055(a)(2) or (3).

exclusively for one or more of the [exempt] purposes" listed in section 501(c)(3). (Emphasis supplied.) Sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. It is only whether petitioner is "operated exclusively" for those tax-exempt purposes that is at issue here. No question is here presented as to whether it was "organized" for such purposes—a question that could well be answered in petitioner's favor.

To qualify for exemption under section 501(c)(3), petitioner must show that it was "organized and operated *exclusively* for * * * charitable * * * purposes". The word "exclusively" is a critical term. In this connection, we stated in *Copyright Clearance Center v. Commissioner*, 79 T.C. 793, 804 (1982):

> While it is true that the word "exclusively" has not been given a literal interpretation, and that a nonexempt purpose even perhaps somewhat beyond a de minimis level has been permitted without loss of exemption, it is nevertheless plain that the word "exclusively" places a definite limit on the "purpose" at issue. * * * [Fn. ref. omitted.]

And in that case we called attention to the limit placed on that word by the Supreme Court in *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945), as follows:

> the presence of a single [nonexempt] * * * purpose, *if substantial in nature*, will destroy the exemption regardless of the number or importance of truly [exempt] * * * purposes.

We also called attention in *Copyright Clearance Center* (p. 804) of our awareness "that in some cases the test has been restated in terms of 'whether an organization's *primary* purpose is exempt or nonexempt.' (Emphasis supplied.) See *est of Hawaii, Inc. v. Commissioner*, 71 T.C. 1067, 1079 (1979), affd. 647 F.2d 170 (9th Cir. 1981); cf. *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 357 n. 2 (1978)". Irrespective of whether there may be any real differences between these two formulations, it is our conclusion that petitioner fails to satisfy either.[11]

Accordingly, petitioner must demonstrate that its cemetery operation is conducted to further no single nonexempt purpose of a substantial nature. While the association has suggested numerous charitable purposes which it pursues in

---

[11]Of course, if there should be a difference in result in the application of these two "tests", the one stated by the Supreme Court must obviously govern.

its cemetery operation, these charitable purposes explain only a portion of its activities. As to the remainder of its activities, we find that petitioner has not shown with what purpose they are pursued and we can conclude only that petitioner has not met its burden of proving that they were not pursued with a substantial nonqualifying purpose. Petitioner's failure in this regard is critical because the existence of a substantial nonqualifying purpose is fatal to the claimed exemption "regardless of the number or importance of truly [exempt] * * * purposes". *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945).

The association suggests, in the administrative record and on brief, that in operating the cemetery its purposes are to lessen the burden of Government, to relieve the poor, and to promote public health. We agree that Linwood, in providing free burials or burial space to veterans[12] and to indigents,[13] lessens the burdens of Government and relieves the burden of the poor. Further, its performance of burial services can be regarded as an activity promoting public health since it "insures that society is not subject to disease from decomposing human remains". *First National Bank of Omaha v. Commissioner*, 681 F.2d 534, 537 (8th Cir. 1982), quoting *Estate of Edwards*, 88 Cal. App. 3d 383, 151 Cal. Rptr. 770 (1979).

However, the interment of the dead and the provision of free burial space to veterans and to indigents do not constitute petitioner's entire operation. Instead, petitioner also sells plots, markers, evergreens, crypts, vaults, and perpetual and special care services. These sales activities are certainly not conducted in order to relieve the poor or to promote public health. Rather, they are carried on by petitioner in the manner of a commercial enterprise and seemed to be pursued with ordinary "cemetery purposes"

---

[12]Federal law gives veterans and their spouses the privilege of burial in national cemeteries without charge. 38 U.S.C. sec. 1002 (1982).

[13]Iowa law provides for the delivery to specific medical colleges of "The body of every person dying in a public asylum, hospital, county care facility, penitentiary, or reformatory in this state, or found dead within the state or which is to be buried at public expense in this state". However, exception is made for those entitled to funeral expenses "under the [state supplemental assistance] provisions of chapter 249" and "if the deceased person expressed a desire during his last illness that his body should be buried or cremated". Iowa Code Annotated sec. 142.1 (West 1986). The expense of such a burial is "paid out of the poor fund of the county in which [the deceased] had a legal settlement". Op. Iowa Atty. Gen. 276, 277 (1928).

rather than with charitable purposes. See *Estate of Amick v. Commissioner*, 67 T.C. 924, 928, 930 (1977); *Wilber National Bank v. Commissioner*, 17 B.T.A. 654, 661 (1929).

Cemetery activities of this sort have not in the past been found to be of a charitable nature. Cf. *Child v. United States*, 540 F.2d 579, 582-584 (2d Cir. 1976), cert. denied 429 U.S. 1092 (1977); *Gund's Estate v. Commissioner*, 113 F.2d 61 (6th Cir. 1940), affg. a Memorandum Opinion of this Court, cert. denied 311 U.S. 696 (1940); *Estate of Amick v. Commissioner*, 67 T.C. 924 (1977); *Wilber National Bank v. Commissioner*, 17 B.T.A. 654 (1929); *Estate of Haley v. Commissioner*, a Memorandum Opinion of this Court dated September 30, 1948, 7 T.C.M. 691, 17 P-H Memo T.C. par. 48,191; *Smith v. United States*, an unreported case (W.D. Mo. 1984, 55 AFTR 2d 85-1548), 84-2 USTC par. 13,595; Rev. Rul. 67-170, 1967-1 C.B. 272. Petitioner has not provided us with any basis for finding that its purposes in engaging in these activities are any different from those of the cemeteries in the foregoing line of cases.

Petitioner relies heavily in seeking section 501(c)(3) status on its contention in substance that all of its activities are carried on for the purpose of lessening the burden of Government. In making this argument, the association assumes that the entire operation of the Linwood Cemetery, including those activities hereinbefore characterized as nonexempt, is a burden of Government. This assumption presumably stems from the circumstance that Linwood Cemetery was once a city cemetery and the association was organized to take over that city cemetery. However, in asserting that its activities lessen a burden of Government because it was organized to take over a Government enterprise, Linwood assumes too much. It assumes that the fact that it was *organized*, in 1875, to lessen a burden of Government is conclusive on the issue of whether it is *operated*, today, to lessen a burden of Government. It is clear that petitioner must be "*both organized and operated exclusively for*" (emphasis supplied) exempt purposes, section 1.501(c)(3)-1(a)(1), Income Tax Regs., and that the purpose of its initial founding goes primarily to the former and not to the latter.

We recognize that the circumstances of petitioner's organization do indicate, first, that operating a cemetery probably was considered, at or before the time of its founding in 1875, to be a burden of Government and, second, that at that time its activities may have been pursued in order to lessen that burden of Government. And we also recognize that "the burial of the dead" was once considered to be "the exclusive province of the community". *Sherwood Memorial Gardens, Inc. v. Commissioner*, 42 T.C. 211, 229-230 (1964), affd. 350 F.2d 225 (7th Cir. 1965). At that time, when cemeteries tended to be "slow and unprofitable" community enterprises (*Sherwood* at 229), the operation of a cemetery might justifiably have been regarded as a "burden of government". However, in "modern times", when "fortunes are daily reaped from such [cemetery] activities by many private individuals", (*Sherwood* at 230), and those activities are carried on in competition with commercial enterprises, they can hardly be characterized as a burden of Government, which, if assumed by petitioner, make petitioner's activity a charitable one. We note that "What is charitable in one generation may be non-charitable in a later age", *Green v. Connally*, 330 F. Supp. 1150, 1159 (D.D.C. 1971), affd. sub nom. *Coit v. Green*, 404 U.S. 997 (1971), quoting 4 G. Bogert, Law of Trusts and Trustees, sec. 369, at 63 (2d ed. 1964). Petitioner has not convinced us that its overall cemetery operation is pursued exclusively with the charitable purpose of lessening a burden of Government.

Petitioner would also have us sweep its nonexempt sales activities in with its exempt activities by analyzing its qualification for section 501(c)(3) status under standards reserved for hospitals. It reasons that, under the standards applied to hospitals, the fact that it receives "payments for products or fees for services [would] not result in the loss of [section 501(c)(3)] charitable status". While the level of free care required of hospitals is much lower than that required of other charitable organizations, we cannot apply the less stringent hospital standards to Linwood because the rationale for so treating hospitals does not apply equally to cemeteries. Hospitals may provide a substantial portion of their services for a price and yet remain qualified under section 501(c)(3) since "the rendering of medical care is a

charitable activity" in and of itself because it promotes health. *Sound Health Association v. Commissioner*, 71 T.C. 158, 178 (1978). See *Eastern Kentucky Welfare Rights Organization v. Simon*, 506 F.2d 1278, 1287 (D.C. Cir. 1974), vacated on other grounds 426 U.S. 26 (1975); Rev. Rul. 69-545, 1969-2 C.B. 117. This is true so long as the class of people treated is large enough so that the community as a whole, rather than just private interests, is served. *Sound Health Association v. Commissioner*, 72 T.C. at 181. Petitioner suggests that its activities promote public health, and it is clear that they do to the extent Linwood disposes of human remains so that "society is not subject to disease from decomposing human remains". *First National Bank of Omaha v. Commissioner*, 681 F.2d 534, 537 (8th Cir. 1982), quoting *Estate of Edwards*, 88 Cal. App. 3d 383, 151 Cal. Rptr. 770 (1979). However, it is equally clear that petitioner's sales of plots, memorials, evergreens, and maintenance services are far beyond what is required to protect public health. For this reason, and because those activities do not lessen the burdens of Government or relieve the poor, they constitute a nonexempt set of activities which is pursued with a nonexempt purpose that is "substantial in nature" and which must "destroy the exemption" sought by petitioner.

Petitioner has not convinced the Court that under the test set forth in *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945), and followed by this Court in *Copyright Clearance Center v. Commissioner*, 79 T.C. 793, 804 (1982), it pursues no substantial nonexempt purpose and is thereby operated "exclusively" for exempt purposes. Even if the test determinative of petitioner's section 501(c)(3) status were reformulated to focus on whether petitioner's "primary purpose is exempt or nonexempt", petitioner would still fail to qualify under section 501(c)(3). The evidence presented by the association which would be pertinent to this latter formulation of the test is scarce and ambiguous.

It consists of the number of free and total burials provided in the years 1980 through 1983 and the association's financial statement for those same years. This evidence shows only that approximately one-half of the burials

in 1980-83 were paid for and one-half were free, but it does not indicate the relative expenditures made on each of these categories of burials or the relative magnitude of each category of burial or of burials compared to other activities in the context of the entire operation. As hereinbefore noted (note 4) it is not even clear what goods and services are provided in a "free burial", beyond burial space.[14] To the extent that only burial space is provided in a "free burial", petitioner's provision of "free burials" might well entail only a comparatively minor burden. Given the record with respect to this issue, we are in no way convinced that petitioner's objective in carrying on its nonexempt activities (sales, maintenance, etc.) does not represent its "primary purpose", nor are we convinced that such activities are anything less than a substantial part of Linwood's operation.

*Decision will be entered for the respondent.*

---

[14]Moreover, it is far from clear that even as to free burial space provided, such space was as desirable or as valuable as the space sold to paying clients. Indeed, in the absence of evidence to the contrary, it would be a fair inference that such free space was not nearly as valuable as the space that was sold.