BILL WILDT'S MOTORSPORT ADVANCEMENT CRUSADE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bill Wildt's Motorsport Advancement Crusade v. Commissioner
Docket No. 22975-87X.
United States Tax Court
T.C. Memo 1989-93; 1989 Tax Ct. Memo LEXIS 93; 56 T.C.M. (CCH) 1401; T.C.M. (RIA) 89093; March 9, 1989; As amended March 14, 1989 Bill Wildt (Trustee), for the petitioner. William I. Miller, for the respondent. RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined that petitioner does not qualify for exemption from income taxation under section 501(c)(3). [1] This case is before us pursuant to a petition for a declaratory judgment under Rule 217. [2]
The questions presented are whether petitioner *95 is operated exclusively for an exempt purpose within the meaning of section 501(c)(3); and whether any part of petitioner's net earnings inure to the benefit of any private individual or shareholder. This case was submitted under Rule 122. The parties have filed a joint stipulation as to the correctness and completeness of the administrative record pursuant to Rule 217(b). The evidentiary facts and representations contained in the administrative record are presumed to be true for purposes of this proceeding. Bill Wildt (Wildt) has been involved in motorsport as a participant, spectator, organizer, and official for 27 years. Wildt states that his "fascination with motorsport supercedes [sic] all other interests," and he defines motorsport as "the competitive measurement of technical achievement and operator proficiency of vehicles operated or controlled by people." Wildt began racing motorcycles at an early age and at age 18 began racing stock cars. Stock car racing turned out to be expensive and economics forced Wildt to try something else; the cost of racing he says, kept him poor and uncompetitive. In an effort to reduce costs, Wildt tried racing a Volkswagen but found *96 that it cost almost as much. Wildt then returned to drag racing motorcycles. As a professional motorcycle racer, Wildt discovered that there was no chance of earning a living and that "everyone in motorsport knew they were being screwed by television * * *. Everyone knew motorsport was excluded [from television] and because of that, we were being destroyed economically." Throughout his 27-year involvement in motorsport, Wildt had witnessed the decline in motorsport, as evidenced by the closing of a number of race tracks including the O'Hare, Soldier, Oswego, Carpentersville and Waukegan speedways. By the time Wildt had reached his thirties, he was an "elder statesman"; most of those he competed against were younger. Wildt determined that as people aged and took on family and additional responsibilities, economics forced them out of motorsport. Wildt states "[m]otorsport's inability to generate enough revenue to reward those that pursue it, causes flight." Wildt illustrates the motorsport community's financial plight by discussing a season in which he competed in more than 50 professional events and won significant awards but still lost about $ 12,000 that season. Wildt states, *97 "I couldn't help but allow discouragement to creep into my thinking. It was one thing when I wasn't winning and going through a learning process (paying one's dues and all), but it was quite another to be competing at a professional level, winning regularly, and still losing my shirt financially." As an "elder statesman" in the racing circuit, Wildt "was beginning to feel a sort-of responsibility to those that looked to me for answers. How do you get a sponsor? How come you can't ever make enough money to break even, even if you win all the races? How come television news doesn't 'cover' the races?" Wildt "was beginning to consider motorsport as a community, an oppressed community outside of mainstream American life . . . unnoticed, not understood, not appreciated, and unrewarded." A racing injury sidelined Wildt for approximately two years. During his convalescence, Wildt "was afforded the luxury of lots of time to think about my own future and the motorsport dilemma." The result of Wildt's contemplation was Bill Wildt's Motorsport Advancement Crusade (the petitioner herein). Wildt decided that "if television's destructive influence on the motorsport community could be turned *98 around, it could be our salvation." In order to gain access to television, Wildt decided to build a 6,000 horsepower, liquid fueled, rocket engine, drag bike. Wildt stated that he left his management position for a major company to devote himself to petitioner because he "wanted to educate the entire United States of America . . . then resume my motorsport efforts in a new climate of public consciousness, understanding, and appreciation." Wildt and Christine Shutz (Shutz) formed petitioner by declaration of trust on August 31, 1984, in the State of Illinois. Wildt and Shutz would serve petitioner as trustees, and as president and secretary, respectively. Petitioner was located, at the time of the filing of this petition, in Chicago, Illinois. Petitioner filed its application for recognition of exemption under section 501(c)(3) on September 27, 1984, with the Chicago District Office of the Internal Revenue Service. The Commissioner issued a final adverse ruling on April 15, 1987. Petitioner is not yet operational, and is waiting for exemption from taxation under section 501(c)(3) before beginning its work. Petitioner's application for recognition of exemption under section *99 501(c)(3), Internal Revenue Service Form 1023, details petitioner's purpose as follows: The organization will use its resources to educate the general public regarding plite [sic] of the technical community in American activities involved in vehicular research. Wildt further explained petitioner's purpose in correspondence with the Internal Revenue Service: "It is our purpose to explain to the general public who the motorsport community is, what we do, why we do it, and why it's important to them!" Wildt states that "[i]f its [sic] got a motor and people compete with it, we try to help the public understand." The methods to be used by petitioner to "help the public understand" are as follows: 1. Distribute a newsletter; 2. Arrange for speakers and demonstrations at different sites nationwide; 3. Develop a program to bring city-sponsored drag racing into urban areas; 4. Work with schools to develop a motorsport program; and 5. Investigate the Federal Communications Commission (F.C.C.) to determine how it operates, what its mission is, who it answers to, and why it was established. The monthly newsletter, "whose mission it is to establish a communications network, bonding *100 all elements of motorsport together," will be sent to every motorsport enthusiast in the country. Wildt explains: Once this relationship [the bonding of the motorsport community] develops and matures, it will be possible to identify the total size of our community and explain to them that we can do something about our predicament, [the decline of motorsport] that through our unified effort, society as a whole, can come to understand and appreciate motorsport and thus support it with vast audiences. Petitioner's representatives would speak anywhere they were invited if they could make suitable arrangements. Petitioner submitted excerpts from some of Wildt's speeches. In one speech Wildt discusses the possibility of using hydrogen as a fuel for cars. Wildt states that motorsport could be used to develop the technology. The idea proposed in the speech is to have the Government sponsor a series of races. Each race would provide one million dollars to the winner and $ 100,000 to anyone who qualified. The "catch" is that the racers have to use hydrogen fuel. The races, Wildt suggests, could also be funded privately. Petitioner's representative will tell the audience that *101 "the motorsport community stands ready to tackle the technical challenges that our society faces, but we cannot perform without funds." The speaker will then state: ALL WE REALLY NEED IS A LITTLE MORE UNDERSTANDING FROM THE GENERAL PUBLIC, A FEW MORE PEOPLE BUYING TICKETS TO ENJOY THE ENTERTAINMENT THAT THIS COMMUNITY HAS TO OFFER. THE KNOWLEDGE THAT, IN ADDITION TO BUYING EXCITING ENTERTAINMENT WITH THE PURCHASE OF A TICKET, THEY ARE SUPPORTING A STRUCTURE THAT CAN CONTRIBUTE TO THEIR OWN WELL-BEING. In order to attract people to the speaking engagements, "a visually spectacular" program is planned, with a "6,000 horsepower motorcycle [owned by Bill Wildt] * * * presented with showgirls dramatically costumed to match the project" on a stage with four levels. [3] Initially, petitioner "will be depending heavily on volunteer girls from the motorsport community" to participate as showgirls; when funds allow, petitioner will hire more girls to be showgirls and buy additional costumes "to a point where the stage and surrounding area glitters more attractively." Also, as a part of the show, petitioner will educate the public about section 501(c)(3) of the Internal Revenue Code *102 by using "showgirls with 501(c)3 [sic] costumes, identifying the categories of exemptions and the reasons for their existence." Petitioner also plans to bring city-sponsored drag racing to urban areas and to work with the schools to introduce motorsport to school-aged children. Wildt does not explain how petitioner plans to accomplish these goals. Wildt does explain why he thinks these programs are important. With respect to the drag racing in urban areas, Wildt states that petitioner wants to develop a way that inner city kids can use motorsport to break their cycle of poverty. As to motorsport in the school system, Wildt states: "[t] is vital that we don't put ourselves in a position to have to go through this whole process [educating the public about motorsport] every decade. * * * We intend that motorsport become part of the fabric of American life." Petitioner plans to investigate the F.C.C. due to lack of coverage of motorsports on television. Wildt states that motorsport's "omission from the television industry's sports news presentations has been instrumental *103 in its rapidly escalating, downward spiral." Wildt also states that "one would be hard-pressed to think of a single successful competitor in the sports entertainment marketplace not included as an integral part of television sports news." Petitioner plans to generate revenues from contributions, corporate sponsorships, corporate giving programs, foundation grants, contributions from motorsport organizations, speaking engagement fees, and Crusade novelty sales (t-shirts, bumper stickers, etc.). Petitioner has not yet decided whether the newsletter would be sold or would be distributed free. Petitioner submitted proposed budgets for 1985 and 1986. For 1985, operating expenses were estimated at $ 179,800. Forty-three percent ($ 78,000) would be used to pay Wildt and Shutz for their services as president and secretary of petitioner. Sixteen percent ($ 28,000) of the proposed budget would be spent on advertising. Thirteen percent ($ 24,000) would be paid for "contracted equipment." [4] Traveling expenses would account for 11 percent ($ 20,000) of the proposed budget. [5] Eight percent ($ 15,000) of the proposed budget would be spent on a van. Office space and office expenses would *104 consume three percent ($ 4,800) of the proposed budget as would the newsletter ($ 5,000) and legal expenses ($ 5,000). For 1986, the proposed budget was $ 903,000. Office space and office expenses were expected to consume *105 three percent ($ 30,000) of the budget. The newsletter expenses also stayed at three percent of the budget ($ 25,000). Also in the 1986 budget was a provision for a new truck and trailer which would consume six percent ($ 50,000) of the proposed budget amount. Legal expenses jumped from three percent ($ 5,000) in 1985 to 11 percent ($ 100,000) in the 1986 budget. Traveling expenses in 1986 would account for 11 percent ($ 100,000) of the budget. Thirteen percent of the budget ($ 120,000) would be paid for "contracted equipment" [6] and advertising moved from 16 percent in 1985 to 44 percent ($ 400,000) in 1986. Wildt and Shutz would again receive $ 78,000 for their services as president and secretary, but this amount would account for only nine percent of the 1986 budget. Section 501(a) provides tax exempt status for organizations described in section 501(c). These sections provide: SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC. *106 (a) EXEMPTION FROM TAXATION. -- An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503. * * * (c) LIST OF EXEMPT ORGANIZATIONS. -- The following organizations are referred to in subsection (a): * * * (3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection *107 (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office. Section 501(c)(3) thus sets forth three requirements a taxpayer must meet to achieve exempt status: (1) the organization must be organized and operated exclusively for exempt purposes; (2) no part of the organization's net earnings may inure to the benefit of any shareholder or individual; and (3) the organization must not engage in political campaigns or, to a substantial extent, in lobbying activities. Greater United Navajo Development Enterprises, Inc. v. Commissioner,74 T.C. 69, 76 (1980), affd. by court order 672 F. 2d 922 (9th Cir. 1981). Only the first two requirements are in issue in this case. 1. An organization must be both organized and operated exclusively for certain specified exempt purposes, such as religious, charitable, or educational purposes *108 in order to be exempt from taxation under sections 501(a) and 501(c)(3).Section 1.501(c)(3)-1(a), Income Tax Regs. Petitioner contends that it meets both the "organizational" and "operational" tests, as an educational organization. The Commissioner does not dispute that petitioner meets the organizational test under section 1.501(c)(3)-1(b), Income Tax Regs., but maintains that petitioner does not meet the operational test since its "activities, including vehicular research and motorsport promotions are activities to promote a competitive and commercial industry." The burden is on petitioner to show, based on the materials in the administrative record, that the Commissioner erred in that determination. An organization may qualify for exemption from income taxation under sections 501(a) and 501(c)(3), only if it is "operated exclusively" for one or more of the exempt purposes specified under section 501(c)(3). Sections 1.501(c)(3)-1(a), (c), Income Tax Regs. The word "exclusively" is a critical term. In Copyright Clearance Center v. Commissioner,79 T.C. 793, 804 (1982), *109 we stated: While it is true that the word "exclusively" has not been given a literal interpretation, and that a nonexempt purpose even perhaps somewhat beyond a de minimis level has been permitted without loss of exemption, it is nevertheless plain that the word "exclusively" places a definite limit on the "purpose" at issue. * * * [Fn. ref. omitted.] In that case we also called attention to the limit placed on that word by the Supreme Court in Better Business Bureau v. United States,326 U.S. 279, 283 (1945), as follows: the presence of a single [nonexempt] * * * purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] * * * purposes. [Emphasis added.] The operational test focuses on "the purpose towards which an organization's activities are directed, and not the nature of the activities themselves." B.S.W. Group, Inc. v. Commissioner,70 T.C. 352, 356 (1978). Whether an organization has a nonexempt purpose that is sufficiently substantial to make it ineligible for a *110 section 501(c)(3) tax exemption is a question of fact. See, e.g., Church By Mail, Inc. v. Commissioner,765 F.2d 1387, 1390 (9th Cir. 1985); Federation Pharmacy Services, Inc. v. Commissioner,625 F.2d 804, 806 (8th Cir. 1980). On the basis of the administrative record, the conclusion is unavoidable that a substantial purpose of petitioner is to promote the competitive and commercial motorsport industry. In determining whether petitioner was operated "exclusively" for exempt purposes, we first examine petitioner's activities. The objective of this examination is to ascertain the purpose for the activities. We also examine petitioner's numerous statements of purpose in the administrative record. Petitioner's activities would consist primarily of publishing a monthly newsletter, presenting a "visually spectacular" program featuring Bill Wildt's 6000 horsepower, liquid fueled, rocket engine, drag bike, and investigating the F.C.C. Petitioner's stated purpose for publishing the newsletter is to unite the motorsport community in a quest for "vast audiences." The "visually spectacular" program with which petitioner plans to "barnstorm" around the *111 country consists of a program featuring Wildt and his motorcycle and speeches. The speeches submitted to this Court focus on the need for the motorsport community to be supported by a ticket-buying public. Petitioner's planned investigation into the F.C.C. also has a commercial purpose. Petitioner believes that the omission of motorsports from television has largely caused the financial difficulties faced by the motorsport community today. Petitioner states that "one would be hard-pressed to think of a single successful competitor in the sports entertainment marketplace not included as an integral part of television sports news." Further, petitioner states that "[w]hile it is true that commercial sports presentation activities is [sic] perhaps in the neighborhood of one percent of the motorsport community, it's [sic] importance to the survival of the community is paramount." It is apparent from the information submitted by petitioner that the major, if not the only, pursuit of this organization is to promote the financial well-being of the highly commercial and competitive motorsport industry. Thus, in our judgment, petitioner has a substantial disqualifying nonexempt purpose. *112 2. No part of the organization's net earnings may inure to the benefit of any shareholder or individual. Wildt, who is petitioner's president, and one of its two founders and trustees, would be paid $ 49,000 per year for his services as president of petitioner. Wildt is also authorized in petitioner's declaration of trust to receive compensation for his services as trustee. In addition, Wildt would receive substantial amounts, per petitioner's budget, for the use of his motorcycle, trailer, etc. In Copyright Clearance Center v. Commissioner,79 T.C. at 806, this Court noted that "the mere fact that a certain group derives a financial benefit from an organization's activities may not be sufficient to disqualify the organization under section 501(c)(3)." This Court cited Goldsboro Art League, Inc. v. Commissioner,75 T.C. 337 (1980), as an example of a situation in which there was financial benefit which was permissible. We explained Goldsboro in Copyright Clearance Center as follows (79 T.C. at 806-807): [T]he organization in question operated an art center which furnished various educational and charitable services *113 for the community which were indisputably of an exempt character. As an incident to its overall activities, it operated two art galleries which invited artists to submit their works for exhibition and possible sale. Only those art works selected by a jury to insure artistic quality * * * were * * * exhibited, and the artists received the proceeds of any sales after deduction of a 20-percent commission. In holding that the organization was exempt, the Court emphasized that the artistic pieces were selected for exhibition by a jury, on the basis of "representation of modern trends" rather than salability, and that the "sales activities [were] * * * incidental to its other activities and serve[d] the same overall objective of art education. [Citation omitted.] In Copyright Clearance Center we found net earnings inuring to the benefit of individuals which did not further indisputably exempt purposes and were not merely "incidental to its other activities". The taxpayer in Copyright Clearance Center was a corporation organized to provide a service through which libraries, commercial organizations, and others could centrally pay license fees for copying of certain copyrighted *114 publications. The taxpayer was organized and operated by publishers and copyright owners; its organizational expenses were met primarily through donations from publishers and copyright owners, and its operating revenues were to be derived from the charge it deducted from each license fee collected. We found that the driving force behind the organization and operation of the taxpayer was the potential for substantial private profit. Thus, we held that the taxpayer failed to qualify for exemption from taxation pursuant to section 501(c)(3). Similarly, in the instant case, we find that the driving force behind petitioner's organization was the potential for substantial profits for petitioner's president, founder and trustee, Wildt. Unlike the situation in Goldsboro, these profits do not further indisputably exempt purposes and are not merely incidental to exempt activities. Petitioner's activities consist of subsidizing Wildt's involvement in a field he loves, even though his professional racing days are, in his words, "over." In describing the events leading to the creation of Bill Wildt's Motorsport Advancement Crusade, Wildt states: [h]aving spent my life as a participant *115 in the motorsport community and having reached the reflective age of 40 (at the time of the "Crusade's" creation), I found myself in the difficult position of having to decide whether to leave the community that I felt myself so inherently a part of or live the remainder of my life in the most frustrating of circumstances . . . a combination of abject poverty combined with a technically creative mind that, due to economics, would see my remaining years spent developing an endless stream of "on paper" ideas that would never see the light of day because of lack of resources. It appears from the administrative record that Wildt viewed petitioner as the solution to his personal economic problems and to the financial distress of the motorsport community in general. The administrative record is replete with statements by Wildt relating to his disappointment and frustration in not being recognized or rewarded by society for his efforts in motorsport. The budgets submitted detail the substantial sums which would be paid to Wildt. In the first year of its proposed budget, a full 43 percent of the budget would be paid to Wildt and Shutz for their duties as officers of petitioner. Further *116 sums would be paid to Wildt for travel and for the use of his motorcycle, trailer, etc. In addition, the trust declaration allows for payments to Wildt for his services as trustee. Meanwhile, Wildt controls petitioner. The "visually spectacular" program is the heart and soul of petitioner; the heart and soul of that program is Wildt and his motorcycle. It is impossible to separate petitioner and Wildt. Petitioner must show that payments to Wildt are reasonable under the circumstances and do not violate the prohibition against any part of the net earnings inuring to the benefit of a private individual. In our judgment, based on the record in this case, petitioner has not carried its burden to show that it was intended to be operated exclusively for exempt purposes, or that its net earnings would not inure to the benefit of private individuals. Thus, the Commissioner properly denied petitioner's request for exemption from taxation pursuant to section 501(c)(3). Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The jurisdictional requirements specified in sec. 7428 have been satisfied: petitioner is the organization whose exempt status is in issue; it has exhausted its administrative remedies; and this action was timely filed. Sec. 7428(b); see Rule 210(c).↩
3. Shutz' duties as secretary and trustee for petitioner would include working as a showgirl and model.↩
4. The contracted equipment listed on the 1985 proposed budget is as follows: (1) rocket project; (1) 25' trailer; (1) powered turntable and stage; miscellaneous background and props; (6) showgirls; (36) costumes. Wildt owns at least six of the costumes; it is unclear whether the additional thirty costumes will be owned or are owned by Wildt. The rest of the equipment listed, excepting the showgirls, is owned by Wildt. Wildt states that the showgirls will be volunteers from the local motorsport community. Thus, it appears that most if not all of the $ 24,000 budgeted for "contracted equipment" will be paid to Wildt. ↩
5. Petitioner states that the traveling will be done primarily by the president (Wildt) and the secretary (Shutz) both of whom will be "barnstorming" around the country with the traveling show. On occasion, petitioner might need to take volunteers with the president and the secretary or send the volunteers to a location ahead of time.↩
6. The contracted equipment listed on the 1986 budget is as follows: rocket display, stage and display; 12 showgirls, 100 costumes. Petitioner intends to use volunteer showgirls and to hire showgirls only when necessary. With respect to the other "contracted equipment", Wildt owns all of it with the possible exception of some of the costumes. The record before this court shows that Wildt owns at least six of the costumes; however, the record does not indicate whether he does own or would own additional costumes. Thus, it is impossible to determine how much of the $ 120,000 budgeted for "contracted equipment" will be paid to Wildt.↩