GEISINGER HEALTH PLAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Geisinger Health Plan v. Commissioner
Docket No. 20793-90X
United States Tax Court
T.C. Memo 1991-649; 1991 Tax Ct. Memo LEXIS 691; 62 T.C.M. (CCH) 1656; T.C.M. (RIA) 91649; December 30, 1991, Filed *691 Decision will be entered for the petitioner. Frederick J. Gerhart and Melissa B. Rasman, for the petitioner. Vivian A. Moore, for the respondent. COHEN, Judge. COHEN
MEMORANDUM OPINION Respondent determined in a final adverse ruling that petitioner did not qualify for exemption from Federal income tax under section 501(a) as an organization as described in section 501(c)(3). Petitioner challenged respondent's determination and has invoked the jurisdiction of this Court for a declaratory judgment pursuant to section 7872. The issue for decision is whether petitioner qualifies for exemption as an organization as described in section 501(c)(3). Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect at the time the petition was filed, and all Rule references are to the Tax Court Rules of Practice and Procedure. The case was submitted for decision on the stipulated administrative record. The facts contained in the administrative record are assumed to be true for purposes of this proceeding. See Rule 217(b)(1). Petitioner has satisfied all the jurisdictional requirements. See Rule 210(c). Background
*692 Petitioner was incorporated in 1984 as a nonprofit corporation. Petitioner owned and operated a health maintenance organization (HMO) under the Pennsylvania Health Maintenance Organization Act, Pa. Stat. Ann. tit. 40, secs. 1551-1567 (Supp. 1991). Petitioner's principal office was located in Danville, Pennsylvania. Petitioner was one of nine related organizations. The eight other organizations, referred to collectively as the Geisinger system and described below, were the Geisinger Foundation (the Foundation), Geisinger Medical Center (GMC), Geisinger Clinic (the Clinic), Geisinger Wyoming Valley Medical Center (GWV), Marworth, Geisinger System Services (GSS), and two professional liability trusts. The Geisinger System
The Geisinger system was a large health care network, the fundamental purpose of which was to provide health care services to residents of northeastern and northcentral Pennsylvania. The Geisinger system's service area covered 27 counties with a total population of 2.1 million. The Foundation controlled petitioner and the other entities in the Geisinger system, as well as three for-profit corporations. The Foundation had the power, under the articles *693 of incorporation and bylaws of petitioner, GMC, GWV, GSS, the Clinic, and Marworth, to appoint the corporate members of those entities, who in turn elected their respective boards of directors. The Foundation's board of directors was composed of civic and business leaders who were representative of the general public in northeastern and northcentral Pennsylvania and were public-spirited citizens. The Foundation, which also raised funds for the Geisinger system's numerous charitable purposes and activities, was recognized by the Internal Revenue Service as an exempt organization as described in sections 170(b)(1)(A)(vi), 501(c)(3), and 509(a)(1). GMC was one of the largest rural health care facilities in the United States. It operated a 569-bed regional medical center and, as of March 31, 1988, had 3,512 employees, including 195 resident physicians and fellows in approved postgraduate training programs. GMC accepted patients without regard to their ability to pay, including Medicare, Medicaid, and charity patients. It also operated a full-time emergency room that was open to all patients, regardless of their ability to pay. In addition, GMC was a teaching hospital that had made *694 an extensive commitment to medical education and was recognized by the Internal Revenue Service as an exempt organization as described in sections 170(b)(1)(A)(iii), 501(c)(3), and 509(a)(1). GWC was a 230-bed hospital located in Wilkes-Barre, Pennsylvania. GWV accepted patients without regard to their ability to pay. It also operated a full-time emergency room that was open to all persons requiring emergency treatment, regardless of their ability to pay, and was recognized by the Internal Revenue Service as an exempt organization as described in sections 170(b)(1)(A)(iii), 501(c)(3), and 509(a)(1). The Clinic was established in 1962 to engage in medical research in conjunction with GMC and employed licensed physicians who performed medical services for GMC, GWV, and other entities within the Geisinger system. As of March 31, 1988, it employed 401 physicians who worked at the Clinic and at 42 other locations throughout the 27-county area serviced by the Geisinger system. The Clinic accepted patients without regard to their ability to pay and was recognized by the Internal Revenue Service as an exempt organization as described in sections 170(b)(1)(A)(vi), 501(c)(3), and 509(a)(1). *695 Marworth operated two alcohol detoxification and rehabilitation centers. Marworth also ran educational programs to prevent alcohol and substance abuse and was recognized by the Internal Revenue Service as an exempt organization as described in sections 170(b)(1)(A)(iii), 501(c)(3), and 509(a)(1). GSS employed management and other personnel who provided services to entities in the Geisinger system. GSS and the two professional liability trusts were recognized by the Internal Revenue Service as exempt organizations as described in sections 501(c)(3) and 509(a)(3). Petitioner's Purpose
Article 3 of petitioner's articles of incorporation (the articles) provided that it was incorporated "for the purpose of conducting exclusively charitable, scientific, and educational activities within the meaning of" section 501(c)(3) and that such activities included: A. Establishing, constructing, maintaining, operating and managing an organized system which combines the delivery and financing of health care and which provides, either directly or through arrangements with others, health services to voluntarily enrolled subscribers for a fixed prepaid fee; B. Studying and investigating *696 the delivery and financing of such services in order to assure their quality and cost effectiveness; C. Engaging in education, study, research and scientific development in the field of prepaid health care delivery and financing systems and related fields; D. Establishing, conducting, maintaining, managing and operating educational programs, courses and studies in the foregoing fields; E. Constructing, operating and maintaining dispensaries, buildings and facilities relating to these purposes; F. Publishing books and writing and disseminating articles or reports relating to these purposes; G. Making donations and other transfers to Geisinger Foundation and to organizations controlled by such Foundation and described in Section 501(c)(3) of the Internal Revenue Code, consistent with and in furtherance of these purposes; and H. Engaging in all activities properly related to the foregoing, including, the requesting of funds from individuals, corporations and other exempt organizations for financing the services to be provided.
Article 4 of petitioner's articles restricted its activities in the following respects: A. No substantial part of the activities *697 of the Corporation shall be the carrying on of propaganda or attempting to influence legislation. B. The Corporation shall not participate in or intervene in (including the publishing or distributing of statements) any political campaign on behalf of any candidate for public office. C. The Corporation shall neither have nor exercise any power, nor shall it engage directly or indirectly in any activity that would invalidate its status (1) as a corporation which is exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code, or (2) as a corporation, contributions to which are deductible under Section 170 of the Internal Revenue Code. D. The Corporation does not contemplate pecuniary gain or profit, incidental or otherwise, to its members, directors, officers or other private persons, and no part of the net earnings of the Corporation shall inure to the benefit of, or be distributed to, any such person, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article 3 hereof.
*698 Petitioner's articles further provided that, in the event of its dissolution, petitioner's assets were to be dedicated to exclusively charitable, educational, or scientific purposes. Pursuant to petitioner's bylaws, the Foundation appointed its own executive committee of its board of directors to serve as petitioner's corporate members. Petitioner's bylaws also provided that its directors be elected by its corporate members from a representative group of its subscribers. Although those directors could be affiliated with group subscribers, they were to be elected because they were public-spirited citizens, not because of their affiliation with group subscribers. In addition to the directors appointed by petitioner's corporate members, its board of directors was also composed of ex-officio directors, namely, the president, executive vice president, and all senior vice presidents of the Foundation, and petitioner's president, who was a director by reason of holding such office. Petitioner was organized for the purpose of promoting health among the residents within its service area. Petitioner promoted the full utilization of the health care services and facilities that the Geisinger *699 system offered to those in its service area. Through petitioner, the Geisinger system was able to reach more people in its service area and to enhance its role as a regional health care provider. For the fiscal year ended June 30, 1987, petitioner generated 8.8 percent of the aggregate gross receipts of all the health care providers in the Geisinger system, and estimates as of that date projected that that percentage would increase to 14.35 percent by the fiscal year ending June 30, 1991. The Geisinger system organized petitioner as a separate entity, rather than placing an HMO in either of the Geisinger system's hospitals (GMC or GWV) or in the Clinic, for several reasons. First, an HMO in Pennsylvania was subject to heavy regulation by the State Department of Health and the State Department of Insurance. An HMO operated as a separate entity focused the regulation and the compliance efforts on the precise activity being regulated. Second, at least one-third of petitioner's directors had to be subscribers of the HMO. See Pa. Stat. Ann. tit. 40, sec. 1557 (Supp. 1991). The Geisinger system attempted to avoid disrupting its ability to govern the entities within that system by *700 operating an HMO as a separate entity. Third, the Geisinger system believed it was preferable to operate an HMO as a separate entity from a system-wide organizational and management viewpoint. Petitioner's Operations
Petitioner provided for the health care of its subscribers at 43 outpatient facilities through the Clinic and at other locations through GMC, GWV, and Marworth, pursuant to contracts with those entities. The two principal categories of health services that petitioner offered were physician services and hospital services. All physician services were provided to petitioner's subscribers pursuant to a Medical Services Agreement between petitioner and the Clinic. Petitioner compensated the Clinic for the physician services provided to its members. The amount of the compensation was a fixed amount per member. That rate was a monthly rate and was set forth in a schedule to the agreement. Petitioner's subscribers were to select a primary care physician from a list provided to them and maintained by the Clinic. The Clinic also arranged to have its physicians available to render emergency health care 24 hours a day, 7 days a week, at the emergency departments of *701 hospitals that contracted with petitioner or at the emergency departments of hospitals where petitioner's subscribers were typically directed for such services. To fulfill its obligations, the Clinic also contracted with other physicians throughout petitioner's service area. For the fiscal year ended June 30, 1987, more than 84 percent of the physician services were provided by physicians who were employees of the Clinic, and the remaining services were provided by physicians who had entered into such contracts with the Clinic. The Clinic compensated all of the physicians who provided services to petitioner's subscribers, including those who provided services pursuant to contracts with the Clinic. Petitioner provided hospital services (inpatient, outpatient, and emergency) to its subscribers through contracts with hospitals in its service area. Two of the hospitals with which petitioner contracted were GMC and GWV. Petitioner paid those entities for hospital services provided to petitioner's subscribers on the basis of a negotiated per diem charge for inpatient services and on the basis of a discounted percentage of billed charges for outpatient services. Petitioner also entered *702 into hospital service agreements with 20 other hospitals. These agreements required that payments for hospital services provided to petitioner's subscribers were to be made on the basis of a negotiated per diem charge or a discounted percentage of billed charges or, in some cases, a combination of both. For the fiscal year ended June 30, 1987, 80 percent of all hospital services rendered to petitioner's subscribers were provided by GMC and GWV. Petitioner also entered into agreements to provide other services to its subscribers, including agreements to provide pharmaceuticals, durable medical equipment, ambulance service, and physical therapy. Finally, petitioner contracted with GSS to provide to petitioner office space, supplies, and administrative services, including payroll, personnel administration, accounting, and data processing services. Petitioner's Membership
Petitioner's membership was open to residents of 17 of the 27 counties that the Geisinger system serviced. Petitioner offered to residents of those rural counties services that might not otherwise be available to them. Findings of the United States Department of Health and Human Services indicated that, *703 as of November 30, 1987, 23 percent of petitioner's members resided in medically underserved areas and 65 percent of its members resided in counties containing medically underserved areas. Under a Non-Group Subscription Certificate (the individual plan), enrollment in petitioner's HMO was available to all individuals who were at least 18 years of age, resided in petitioner's 17-county service area, and completed a medical history questionnaire. Upon enrollment and receipt by petitioner of the required quarterly premium, subscribers were entitled to coverage under the individual plan. Membership was also available to certain family dependents of a subscriber. In the first 9 months of its operation, petitioner accepted all but 6 percent of its individual applicants and, from its inception through June 30, 1987, petitioner's cumulative rejection rate for individual applicants was 11 percent. By December 16, 1985, less than 1 year after petitioner began operations, petitioner had enrolled 2,380 individual members, including both individual subscribers and their dependents. As of March 31, 1988, that number had increased to 4,396. Under a Group Subscription Agreement (the group *704 plan), enrollment in petitioner's HMO was available to individuals who resided in petitioner's service area and were members of an enrolled group. Any member of an enrolled group with at least 100 eligible enrollees who resided within petitioner's service area was eligible to enroll as a group subscriber without completing a medical history questionnaire. Members of groups with less than 100 eligible enrollees were generally required to complete such a questionnaire. Upon enrollment and receipt by petitioner of the required quarterly premium, subscribers were entitled to coverage under the group plan. Membership was also available to certain family dependents of a subscriber. As of March 31, 1988, petitioner had enrolled 448 groups. In those groups, there were 24,946 group subscribers (individuals of an enrolled group) and 66,441 group members (group subscribers and their dependents). Individuals whose membership under the group plan was discontinued due to termination of employment with the enrolled group or due to a change in status as an eligible dependent could elect to convert their coverage to the individual plan, if they otherwise satisfied the eligibility requirements *705 of that plan. Petitioner's individual members and group members were required to pay the same amount to petitioner for the health care services that they received, which amount was determined on a community rating system by balancing high-risk members against low-risk members. Members were also required to pay copayments for certain goods and services provided to them. In the event that any subscriber failed to pay, or have paid on his behalf, any amount due to petitioner or failed to make any required copayment, the subscriber's coverage under the individual or group plan was terminated upon a 30-day written notice by petitioner, unless payment was made within such 30-day period. Individual members were also required to pay an additional amount that group members did not pay. This amount (roughly 8 percent of the amount paid for health care) covered the additional costs associated with handling individual memberships. Petitioner offered its coverage to Medicare recipients at a reduced rate on a wraparound basis. That is, petitioner offered to cover what Medicare did not. Less than 1 year after petitioner began operations, petitioner had enrolled 360 Medicare recipients as *706 group subscribers and 25 as individual subscribers. As of March 31, 1988, petitioner had enrolled 1,064 Medicare recipients. Petitioner enrolled a small number of Medicaid recipients in a few exceptional situations. Petitioner could not offer coverage to Medicaid recipients unless it had contracted with the Pennsylvania Department of Public Welfare, which administered the Medicaid program in that State. As of June 24, 1988, only 3 of the 29 licensed HMO's in Pennsylvania had entered into agreements with that department to serve Medicaid recipients. Petitioner negotiated with the department but, as of that date, had not reached an agreement that would have enabled petitioner to enroll Medicaid recipients. Petitioner also adopted a subsidized dues program. The following is a description of the program presented to and subsequently adopted by petitioner's board of directors: Premium Subsidy Fund
As the charter of GHP stipulates that the corporation is to be a charitable one in the same degree, for tax purposes, as the Geisinger Clinic and other exempt corporations, and as proper objects of charity are GHP members who suffer financial misfortune and are unable to pay *707 their GHP premiums, or all of them, the following arrangement for charitable relief of such unfortunate members is submitted for consideration of the Board. 1. That a fund be established for subsidy of the premiums of GHP members who meet the criteria for subsidy established from time to time by that Board. 2. That the fund be amassed by: a. Charitable donations designated for the fund by the donors, b. Allocations from unrestricted charitable donations, to be determined by the Board from time to time as such funds are available and needed, and c. Allocations from the operating funds of GHP to be determined at least annually by the Board. 3. That the fund be administered by a committee of the Board to whom member applications for subsidy are to be directed. Observations
1. Several other HMO's have such subsidiary funds. 2. Such a fund adds to the security of members, any of whom may at some time suffer financial misfortune due to loss of employment, physical or mental disability or other causes beyond their control and which impute no dishonor to the member. 3. A premium subsidy funded, in part, by earnings from member premiums may be viewed by members as *708 less stigmatized than other forms of relief.
As of January 8, 1986, petitioner projected that it would raise $ 125,000 in contributions over its first 3 years of operation, which initial funding would be used to subsidize the premiums of 35 of its members. The implementation of that program was delayed because petitioner operated at a loss from its inception in early 1985 through the fiscal year ended June 30, 1988, and because petitioner could not raise charitable contributions until it received recognition of its tax-exempt status under section 501(c)(3). The Administrative Proceedings
In the initial ruling letter, respondent stated that the issue of whether an HMO was entitled to exemption as an organization as described under section 501(c)(3) was discussed at length in Sound Health Association v. Commissioner, 71 T.C. 158 (1978). Respondent listed 14 factors upon which, he asserted, the decision in that case was based. Respondent concluded that petitioner did "not conform to the law as interpreted in Sound Health" and was "operated to serve the private interests of * * * [its] subscribers in more than an incidental manner." In a final adverse *709 ruling, respondent determined that petitioner was not operated exclusively for exempt purposes within section 501(c)(3). Respondent stated: Because you do not meet the criteria for exemption set forth in Sound Health Association v. Commissioner, 71 T.C. 158 (1978), acq. 1981-2 C.B. 2, you are not operated for public purposes as required by section 501(c)(3) and your operations result in more than incidental private benefit. In addition, you do not qualify for exemption as an integral part of your parent because you do not provide essential services to your parent.
Discussion
Section 501 provides: (a) Exemption From Taxation. -- An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503. * * * (c) List of Exempt Organizations. -- The following organizations are referred to in subsection (a): * * * (3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings *710 of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, * * * and which does not participate in, or intervene in * * * any political campaign on behalf of (or in opposition to) any candidate for public office.
In order to be exempt from taxation as an organization as described in section 501(c)(3), an organization must be both organized and operated exclusively for one or more of the purposes specified in that section. Sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. These two requirements are known as the "organizational" and "operational" tests. If an organization fails to meet either test, it is not ex empt. Sec. 1.501(c)(3)-1(a)(1), Income Tax Regs.; Levy Family Tribe Foundation v. Commissioner, 69 T.C. 615, 618 (1978). Whether an organization satisfies the operational test is a question of fact to be resolved on the basis of all the evidence presented by the administrative record. B.S.W. Group, Inc. v. Commissioner, 70 T.C. 352, 357 (1978). An organization will be regarded as "operated exclusively" *711 for one or more exempt purposes only if it engages primarily in activities that accomplish one or more of the exempt purposes specified in section 501(c)(3). Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. "It is the purpose toward which an organization's activities are directed that is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization." Sound Health Association v. Commissioner, 71 T.C. 158, 184 (1978). We must consider whether there is present here a disqualifying nonexempt purpose that is substantial in nature. Copyright Clearance Center v. Commissioner, 79 T.C. 793, 804 (1982). The proper focus is on the purpose or purposes furthered by an organization's activities, not on the nature of those activities. Section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs., further provides that an organization is not organized or operated exclusively for an exempt purpose: unless it serves a public rather than a private interest. Thus, * * * it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the *712 creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests.
The private interests served by the organization typically are insiders, that is, persons who are private shareholders or individuals having a personal and private interest in the activities of the organization. See Sound Health Association v. Commissioner, 71 T.C. 158, 185-187 (1978); see also sec. 1.501(a)-1(c), Income Tax Regs. An organization that confers benefits on disinterested persons may also cause it to serve private interests within the meaning of section 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. See American Campaign Academy v. Commissioner, 92 T.C. 1053, 1069 (1989). Whether an organization serves private interests within the meaning of that regulation is resolved "by examining the definiteness and charitable nature of the class to be benefited and the overall purpose for which the organization is operated." Aid to Artisans, Inc. v. Commissioner, 71 T.C. 202, 215 (1978). The furnishing of medical care or the operation of a hospital or an HMO is not specifically listed as *713 a qualifying exempt activity under section 501(c)(3). The provision of medical services must therefore fall within the words "charitable purpose" to be exempt. The term "charitable" is used in its generally accepted legal sense, and the law of charitable trusts is applicable in determining what is charitable in that sense. Sec. 1.501(c)(3)-1(d)(2), Income Tax Regs.; Sound Health Association v. Commissioner, 71 T.C. 158, 177 (1978). In that case, we held that the rendering of medical care and the promotion of health are charitable activities. This does not mean, however, that any organization whose purpose is to benefit health is automatically entitled to the desired exempt status. See Federation Pharmacy Services v. Commissioner, 72 T.C. 687, 692 (1979), affd. 625 F.2d 804 (8th Cir. 1980). Our task in this declaratory judgment action is to render an analysis only of the reasons set forth in the final adverse ruling denying petitioner's status as a 501(c)(3) organization. Houston Lawyer Referral Service, Inc. v. Commissioner, 69 T.C. 570, 573 (1978). The burden is therefore on petitioner to show that *714 it is operated exclusively for "charitable purposes" and for public, rather than private, interests and that the Commissioner erred in his determination. See B.S.W. Group, Inc. v. Commissioner, 70 T.C. 352, 356 (1978); see also Rule 217(c)(2)(A). Community Benefit Standard
In Sound Health Association, we used the tests applied to determine the charitable status of a hospital to determine the status of an HMO. We explained that a hospital's charitable status was traditionally based on the "extent of its financial ability" standard, which required that the care of indigent patients be the primary concern. See Rev. Rul. 56-185, 1956-1 C.B. 202. That standard had changed, however, to one of "insuring that adequate health care services are actually delivered to those in the community who need them." Sound Health Association v. Commissioner, 71 T.C. 158, 180-181 (1978). Respondent also acknowledged these changes in Rev. Rul. 69-545, 1969-2 C.B. 117, in which he adopted the so-called "community benefit" approach. Under this approach, the charity must serve a sufficiently *715 large class so that it is of benefit to the community, and, as a corollary, private interests must not so benefit in any substantial degree. Sound Health Association v. Commissioner, 71 T.C. at 181. In applying this community benefit approach in Sound Health Association, we noted the similarity in operations between the HMO in that case and the hospital in Rev. Rul. 69-545, 1969-2 C.B. 117, which respondent determined was operated for charitable purposes. The HMO in Sound Health Association operated an outpatient clinic and had its own staff of physicians. It also served Medicaid and charity patients and opened its clinic to the nonmember public on a fee-for-service basis. The clinic provided emergency care, within its capabilities and within normal clinic hours, to those who needed it whether a member or not and without regard to the patient's ability to pay. We concluded that the HMO provided a benefit to a sufficiently large class in the community and, hence, satisfied the operational test of section 1.501(c)(3)-1(c)(1), Income Tax Regs. It was that HMO's particular form of membership organization that most qualified *716 it as an organization providing benefit to the community inasmuch as: the class of persons eligible for membership, and hence eligible to benefit from the Association's activities, is practically unlimited. The class of possible members of the Association is, for all practical purposes, the class of members of the community itself. * * * [Sound Health Association v. Commissioner, 71 T.C. 158, 185 (1978).]
Although the major barrier to its membership was a lack of money, the HMO had implemented a subsidized dues program that demonstrated that this barrier was not intended to be absolute. We stated: If sufficient donations and other moneys can be accumulated to fund adequately the program, it will provide an additional benefit to the community. It is safe to say that the class of persons potentially benefited by the Association is not so small that its relief is of no benefit to the community. * * * [Sound Health Association v. Commissioner, 71 T.C. 158, 185 (1978).]
The Parties' Positions
Both parties agree that the resolution of the issue in this case is controlled by our decision in Sound Health Association *717 . They disagree, however, as to how that case is to be applied to the facts in this case. Petitioner's position is that that case merely applied the general requirement that an HMO must be organized and operated exclusively for charitable purposes. Petitioner argues that it is like the HMO in Sound Health Association in all important respects and that any differences in its operations are not dispositive. Petitioner contends that the key is that its purpose was to promote health and that all of its activities were directed at ensuring that health care services were provided to its members. Petitioner also argues that the context in which it operated also demonstrates that it was operated for the benefit of the community. Respondent determined and now maintains that petitioner has failed to satisfy the operational test. Respondent argues that a comparison of petitioner's activities with those of the HMO in Sound Health Association reveals the many significant differences between the two and that petitioner lacks several of the "critical community benefit factors" that supported our conclusion that the HMO in that case was operated exclusively for charitable purposes. *718 Respondent does not dispute that petitioner's purpose, in general, was to promote health, but he asserts that petitioner did not serve a sufficiently large class in the community. Respondent argues that "A logical corollary of the fact that petitioner fails the community benefit test is that petitioner is operated for the private benefit of its subscribers." Petitioner contends that it provided for the delivery of health care services to a sufficiently large or indefinite class to constitute a benefit to the community because its class of possible members was, like the HMO in Sound Health Association, "practically unlimited." Respondent contends that petitioner's membership was improperly limited to healthy individuals "who can afford petitioner's monthly fees." Under its individual plan, the only requirements for enrollment in petitioner's HMO were that an individual be at least 18 years of age, reside within petitioner's service area, and complete a medical history questionnaire. Enrollment was also open to individuals upon termination of their eligibility under the group plan. It is not a "substantial limitation" that petitioner required applicants to complete a medical *719 history questionnaire or that it had turned down 11 percent of the individual applicants from its inception through June 30, 1987. An organization does not have "to bankrupt itself to prove that it is 'charitable' within the meaning of sec. 501(c)(3)." Sound Health Association v. Commissioner, 71 T.C. at 188 n.15. It is not significant in this case that individuals were required to pay an additional amount that group members were not required to pay; this amount reflected solely the additional costs associated with handling individual memberships. Further, nothing in the record indicates that all of petitioner's members, group or individual, did not get substantially equal service and benefits. Sound Health Association v. Commissioner, 71 T.C. at 188. In sum, there are no substantial restrictions on "the class of persons eligible for membership, and hence eligible to benefit from" petitioner's activities. Sound Health Association v. Commissioner, 71 T.C. at 185; emphasis supplied. Compare United States v. La Societe Francaise De Bien. Mut., 152 F.2d 243, 245 (9th Cir. 1945); Baltimore Health and Welfare Fund v. Commissioner, 69 T.C. 554 (1978), *720 upon which respondent relies. The implementation of a subsidized dues program by the HMO in Sound Health Association also supported our conclusion that the HMO benefited a sufficiently large class in the community. This demonstrated that the major barrier to its membership, a lack of money, was not absolute. Although petitioner had also adopted a subsidized dues program, respondent argues that it was not a "meaningful" program because petitioner's initial projections were that it would subsidize the subscription fees of only 35 subscribers during its first 3 years of operation. Petitioner's subsidized dues program is comparable to that of the HMO in Sound Health Association in that it "would be used to help subsidize persons who wanted membership but who could not make the full monthly payments." 71 T.C. at 184. There is no indication, in relative terms, of the extent to which that HMO's subsidized dues program would benefit its membership. We stated that, if sufficient donations could be accumulated to fund that program, it would provide an additional benefit to the community. Sound Health Association v. Commissioner, 71 T.C. at 185. *721 Similarly, petitioner's program would provide such an additional benefit to the community if sufficient donations were accumulated. Also, petitioner operated at a loss during that period and its ability to raise any charitable contributions was hindered by its failure to receive tax-exempt status. We conclude that petitioner's class of possible members is, like the HMO in Sound Health Association, "practically unlimited." "When possible membership is so broad, benefit to the membership is benefit to the community." 71 T.C. at 190. Thus, there was no prohibited private benefit to insiders. See Sound Health Association v. Commissioner, 71 T.C. at 185-189. Nor were petitioner's subscribers "disinterested persons" upon whom a prohibited private benefit was conferred. Compare American Campaign Academy v. Commissioner, 92 T.C. 1053, 1065-1072 (1989). We therefore reject respondent's contention that petitioner's operations conferred a substantial private benefit on its subscribers. Respondent cites the following differences between petitioner's operations and those of the HMO in Sound Health Association to support *722 further his contention that petitioner was not operated for the benefit of the community: Petitioner does not provide health care directly to its subscribers, but arranges, by contracts with hospitals, clinics, pharmacies, etc., for care to be provided to its subscribers by these entities. Petitioner does not own or operate any facility at which health care is provided. Petitioner does not provide any services to non-subscribers either on a fee-for-service basis or for free or at reduced rates for the indigent or Medicaid recipients. Petitioner does not provide emergency care to any person in the community without regard to their ability to pay. * * *
We will discuss briefly certain of these asserted "critical differences" and then explain why they are not determinative in this case. Petitioner's primary activity, as respondent characterizes it, was "arranging" for health care services to be provided to its members through contracts with other entities, while the HMO in Sound Health Association operated its own clinic and employed salaried physicians and nurses who then provided directly to its members the health care services for which they had contracted. The *723 HMO in Sound Health Association, however, also contracted with other organizations, including hospitals, pharmacies, radiologists, and laboratories, to provide health care services and supplies to its members. Thus, there is no absolute requirement that petitioner had to provide directly all such services to its members at its own facilities. Further, although petitioner did not have any program or plans to offer free or reduced-cost health care to indigent persons and did not provide health care services to Medicaid patients, it is the organization's ability to ensure that adequate health care services are actually delivered to a sufficiently large class in the community that it serves that is critical, not, as respondent acknowledges in his brief, that "any absolute amount of free care" be provided. In any event, petitioner did offer some reduced-cost health care through its subsidized dues program and by offering health care services to Medicare recipients at a reduced rate. Further, offering services to Medicaid recipients was not a factor discussed in Rev. Rul. 69-545, 1969-2 C.B. 117. Also, that petitioner did not offer its services to the *724 nonmember public on a fee-for-service basis and did not operate an emergency room that was open to all persons requiring emergency care were attributable, at least in part, to petitioner's failure to operate its own medical facility. Offering health care services on a fee-for-service basis "could result in new membership applications." Sound Health Association v. Commissioner, 71 T.C. 158, 187 n.14 (1978). The failure to offer this service did not, however, present an additional barrier to enrollment. Finally, respondent asserts that the operation of an emergency room is "an especially important element" in determining whether petitioner was operated for the benefit of the entire community. See also Sound Health Association v. Commissioner, 71 T.C. at 181-182. In Rev. Rul. 83-157, 1983-2 C.B. 94, however, respondent ruled that a hospital was not required to operate an emergency room to qualify for exemption as an organization as described in section 501(c)(3) where such services were adequately provided by another institution in that community. In this case, petitioner contracted with GMC, GWV, and 20 unrelated *725 hospitals to provide hospital services to its subscribers. Over 80 percent of those hospital services rendered to petitioner's subscribers was provided by GMC and GWV, both of which operated full-time emergency rooms that provided emergency treatment to all patients without regard to their ability to pay. It is apparent that respondent based his determination that petitioner was not an organization as described in section 501(c)(3) on the above differences between petitioner's operations and those of the HMO in Sound Health Association. Whether petitioner is an organization as described in that section, however, must be determined by examining all the facts and circumstances, not on the presence or absence of one or more of the factors discussed in that case. Petitioner's exempt status, therefore, is properly based on its ability to ensure that health care services are actually delivered to the community, not on its ability to deliver those services in a certain manner. To deny petitioner exempt status because of those differences would improperly focus on the nature of its activities, rather than on the exempt purpose furthered by the activities that it actually performed. *726 The determinative conclusion in this case is that petitioner's purpose for engaging in its activity (the "arranging" for health care services to be provided to its members) was a charitable one (the promotion of health). Respondent did not determine or allege that petitioner was operated for a substantial commercial purpose, which distinguishes this case from cases where tax-exempt status has been denied an organization that operated for a charitable purpose because it was operated for a substantial nonexempt commercial purpose. See, e.g., Federation Pharmacy Services v. Commissioner, 72 T.C. 687, 691-694 (1979), affd. 625 F.2d 804 (8th Cir. 1980). Thus, even if the activity of arranging for the delivery of health care services is not itself inherently charitable, it does further petitioner's exclusively exempt purpose of promoting health. In conclusion, the facts in the administrative record establish that petitioner's purpose was to promote health within the area that it served. Petitioner was able to provide for the delivery of health care services within that area, its membership was practically unlimited and provided a benefit to the *727 community, and it was not operated for the private benefit of its subscribers or for commercial purposes. We therefore conclude that respondent erred in his determination that petitioner is not an organization as described in section 501(c)(3). We have considered the other arguments of the parties, and they do not affect our conclusion. Decision will be entered for the petitioner.